BARRETT-CROFOOT INVESTMENTS, INC., f.k.a. BARRETT-CROFOOT, INC., AND BARRETT-CROFOOT CATTLE, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barrett-Crofoot Invs. v. Commissioner
Docket No. 3015-91
United States Tax Court
T.C. Memo 1994-59; 1994 Tax Ct. Memo LEXIS 60; 67 T.C.M. (CCH) 2166; February 15, 1994, Filed *60 An appropriate order will be issued denying petitioners' motion for partial summary judgment. For petitioners: William D. Elliott and William H. Hornberger. For respondent: John S. Repsis, George E. Gasper, and William O. Henck. SCOTT SCOTT MEMORANDUM OPINION SCOTT, Judge: This matter is before the Court on petitioners' Motion for Partial Summary Judgment (the motion), filed April 27, 1993, pursuant to Rule 121. [1]
Respondent determined deficiencies in petitioners' income tax for the fiscal years ending June 30, 1986, June 30, 1987, and June 30, 1988, in the amounts of $ 16,560, $ 1,624,220, and $ 1,091,033, respectively. The issue for decision is whether according to the doctrine of collateral estoppel, the doctrine of judicial estoppel, or the doctrine of res judicata respondent is estopped from denying that a corporation *61 to which petitioners made loans in 1987 and 1988 obtained those loans by misrepresentation without an intent to repay. The facts presented below are assumed based on the pleadings and other pertinent materials in the record. Rule 121(b). They are stated solely for purposes of deciding the motion. Fed. R. Civ. P. 52(a); see also Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992). Some of the facts have been stipulated and are found accordingly. At the time of the filing of the petition in this case, petitioners' principal place of business was located in Hereford, Texas. At all times relevant to the present case, petitioner Barrett-Crofoot Cattle, Inc. (BCCI), was a wholly owned subsidiary of petitioner Barrett-Crofoot Investments, Inc. (BCII). BCII is engaged in the custom cattle feeding business. BCCI is also involved in the cattle business. Petitioners timely filed their consolidated Federal income tax returns for the tax years ending June 30, 1986 (the 1986 return), June 30, 1987 (the 1987 return), and June 30, 1988 (the 1988 return). In early 1980, BCII began to do business with Mr. Jim Kassahn and Mr. Kassahn's wholly owned corporation, *62 J.P. Family, Inc. (J.P.). BCII and Mr. Kassahn executed a partnership agreement creating the B-C & K Cattle Co., also referred to as Barrett Crofoot and Kassahn (B-C & K). According to the partnership agreement, the profits and losses of B-C & K were to be split equally between BCII and Mr. Kassahn. During the years in issue, B-C & K was engaged in the business of purchasing, feeding, processing, hedging, and selling cattle, other livestock, feed, agricultural supplies, and animal supplies. Sometime after the formation of B-C & K, Mr. Kassahn's interest in B-C & K was transferred to J.P. On October 29, 1986, B-C & K executed a promissory note payable to BCII for amounts advanced by BCII to B-C & K, up to $ 30 million. This note was signed by Mr. Ed Barrett as president of BCII and by Mr. Kassahn. As security for the note, B-C & K gave to BCII a security interest in all of B-C & K's cattle. The entire principal amount of the original note was due and payable on June 30, 1987. On June 30, 1987, the note was renewed and the principal amount of the note was increased to $ 40 million. This second note was signed only by Ed Barrett as President of BCII and was due and payable *63 on June 30, 1988. On June 30, 1988, B-C & K dissolved. On the date of dissolution, B-C & K was indebted to BCII and J.P.'s share of this debt was $ 9,712,685.48 (the $ 9,712,685.48 debt). Around June 11, 1987, J.P. borrowed $ 4,450,000 from BCII (the $ 4,450,000 debt) and executed a note evidencing the debt (the $ 4,450,000 note). [2] As part of the security for the $ 4,450,000 note, on June 18, 1987, Mr. Kassahn, as president of J.P., executed an Assignment of Partnership Interest, which assigned J.P.'s interest in B-C & K to BCII. Around the *64 end of August 1987, J.P. voluntarily filed a petition under chapter 11 of the Bankruptcy Code, 11 U.S.C., in the United States Bankruptcy Court for the Northern District of Texas. Mr. Walter O'Cheskey was appointed trustee for J.P. Claims against the bankrupt estate were made according to 11 U.S.C. section 501 (1984). BCII filed a claim for $ 79,886,502.21 based on loans made to J.P. which had not been repaid. On December 21, 1987, respondent filed a claim of at least $ 1,680,891. This claim appears to be for taxes owed by J.P. for the fiscal year ending August 31, 1986. In May 1988, Mr. O'Cheskey, as trustee, filed a motion with the bankruptcy court objecting to respondent's determination and requesting that the amount of tax owed be determined by the bankruptcy court. Respondent had an audit of J.P.'s books conducted which resulted in the determination of deficiencies for tax years ending August 31, 1981, 1982, 1983, 1984, 1985, 1986, 1987, and 1988. For the tax year ending August 31, 1987, the audit determined that there should be included in J.P's income amounts borrowed by J.P. that respondent determined were received by misrepresentations. *65 The following debts were the ones respondent included in J.P.'s taxable income: Holder of the note
Amount of debt
First National Bank Amarillo
$ 12,803,094 Hale County State Bank Plainview
1,490,488 Barrett-Crofoot, Inc.
4,450,000 Republic Bank Lubbock
393,934 First State Bank of Bovina
488,795 Furrs Group
3,400,000 Furrs Group
(100,000)
Total 22,926,311 This list includes the $ 4,450,000 debt, but does not include the $ 9,712,685.48 debt. On May 17, 1989, J.P. filed its Federal income tax return for the year ending August 31, 1988. On Form 982 (Reduction of Tax Attributes Due to Discharge of Indebtedness), J.P. reported $ 20,404,215 of cancellation of indebtedness income which was excluded from income as part of a title 11 case. Instead, J.P. reduced its tax attributes in accordance with section 108(b)(1). On July 12, 1989, a hearing was held by the bankruptcy court for consideration of the motion for determination of amount of tax due (the bankruptcy hearing). The following persons made appearances at the bankruptcy hearing: (1) Mr. John C. Sims, representing the trustee; (2) Mr. Kent Anderson, representing the Department of Justice, Tax Division; *66 and (3) Ms. Arlene Sandifer, representing Jim and Paula Kassahn. According to exhibits introduced at the bankruptcy hearing that summarized the results of the audit of J.P.'s books, respondent's agent had made the following determination as to J.P.'s tax liability as of July 12, 1989: Tax due
TYE August 31
(refund) 1981
($ 27,771)  1982
0 1983
(44,296)
1984
(401,853)
1985
(1,680,891)
1986
0 1987
2,151,383 1988
14,621 After interest and additions to tax were added to the above amounts, it was respondent's position that J.P. was due a $ 82,774 refund from respondent. Mr. Kennel Castle, the revenue agent who conducted the audit of J.P., testified at the bankruptcy hearing as follows: The main adjustment in this audit relates to loans that were received by J.P. Family, Inc., which our proposal is that those loans are to be considered as income. They were received from misrepresentation, and our position is that those loans were not paid back, and at the end of the 8708 year those were the amounts.
Upon being questioned about this again later, Mr. Castle further reiterated that respondent's position was that the loans were received by misrepresentation *67 and that they were to be included in income because J.P. did not intend to repay the loans. Mr. Sims, the trustee's representative, later stated: Your Honor, for the court's information, we first contested those matters, but based on the law that we read and furnished to us by the Internal Revenue, there are many decisions in the Fifth Circuit and now the tax courts that hold that if they don't intend to pay it back when they borrow the money then it's income for that year that they borrowed it, and that's why we have not -- I think the case law is against us on that issue, and I wanted the court to know that because that is obviously a large sum of money.
Subsequently, Mr. Sims declared that the trustee agreed that $ 82,774 should be returned to the estate. Mr. O'Cheskey testified that one of the main issues to be decided by the bankruptcy court in the tax determination proceeding was J.P.'s "intent to repay loans". At the close of the bankruptcy hearing, the judge stated an examination of J.P.'s taxes for 1981 through 1988 had been made and not contested by the trustee and that: No other party of interest has come forward with evidence or objection that would *68 place a case of controversy of the issue or an issue of examination. * * * When it comes to adjudication, the court still must have a case of controversy, and there simply has not been a case of controversy presented over this examination.
The court entered an order in which it was stated that "The Director of Internal Revenue has notified the Trustee that the amount of refund due is $ 82,774.00". The court then "DETERMINED, that the amount due to the Debtor J.P.'s FAMILY, INC. for taxes incurred during the period set out above is $ 82,774.00". This amount was ordered paid and the debtor discharged of income tax liabilities for the years 1981 through 1988. Neither Mr. Kassahn nor Mr. Ed Barrett was called as a witness in the bankruptcy court. Mr. Kassahn in a deposition taken under oath testified that it was his intent as the sole owner of J.P. that J.P. repay the loans. On its consolidated Federal income tax returns for tax years ending June 30, 1987, and June 30, 1988, petitioners claimed the following bad debt deductions: Tax year ending
June 30 in which
Principal
deduction taken
Debtor
amount of debt
1987
Jim Kassahn $ 80,798.04
1987
J.P.
4,450,000.00
1987
Jim Kassahn [1] 939,826.84
1988
J.P.
9,712,685.48
*69 For the tax years ending June 30, 1987, and June 30, 1988, petitioners also claimed deductions of $ 61,368.65 [3] and $ 37,218.60, respectively, of accrued interest owed to it but that it now considered a bad debt. On November 15, 1990, respondent mailed a notice of deficiency to petitioners determining their taxable income for the 1986 tax year, the 1987 tax year, and the 1988 tax year. One of the adjustments made to petitioners' income as reported was the disallowance of the claimed bad debt deductions for the 1987 tax year and the 1988 tax year. Specifically, respondent disallowed the following amounts claimed as bad debt deductions: Description
1987
1988
Bad debts -- principal amount
$ 5,470,625
$ 9,712,685
Bad debts -- accrued Interest
[1] 143,642
37,219
Total  $ 5,614,267
$ 9,749,904
*70 Respondent explained that the disallowance of the claimed bad debt deduction was based on the failure of petitioners to show that the debts became worthless in the year the deduction was claimed. In their petition, petitioners alleged that the amount claimed as a bad debt deduction should be allowed as a theft loss since the loans were obtained by misrepresentation and without an intent to repay. In their motion for partial summary judgment, petitioners allege that respondent is estopped to deny that they sustained a theft loss because of the position the Government took in the bankruptcy case of J.P. However, petitioners' argument goes merely to the obtaining of the loans through misrepresentation and without intent to repay and not to whether under Texas law the misrepresentation and lack of intent to repay were sufficient to constitute theft. We will, therefore, deal here only with the facts petitioners contend respondent is estopped to deny. Petitioners argue in support of their motion that according to the doctrine of collateral estoppel, the doctrine of judicial estoppel, or the doctrine of res judicata, respondent is estopped from denying the following facts: 1. BCII *71 extended a loan to J.P. in the amount of $ 1,250,000; 2. BCII extended a loan to J.P. in the amount of $ 3,200,000; 3. The funds represented by the $ 1,250,000 debt were obtained through misrepresentation; 4. The funds represented by the $ 3,200,000 debt were obtained through misrepresentation; 5. The funds represented by the $ 9,712,685.48 debt were obtained through misrepresentation; 6. J.P. did not intend to repay the $ 1,250,000 debt; 7. J.P. did not intend to repay the $ 3,200,000 debt; and 8. J.P. did not intend to repay the $ 9,712,685.48 debt. (These facts are collectively referred to as the estoppel facts.) Based on the record in this case, we conclude that petitioners have failed to show that respondent is estopped to deny these facts. The record does not show that the $ 9,712,685.48 debt was involved in J.P.'s bankruptcy case. The record also fails to show that the issue of whether the loans to J.P. involved in its bankruptcy case were obtained by misrepresentation without an intent to repay was litigated in the bankruptcy case. Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials of phantom factual issues. *72 Northern Ind. Pub. Serv. Co. & Subs. v. Commissioner, 101 T.C.    ,     (1993) (slip op. at 3) (citing Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974)). Because the granting of summary judgment decides an issue against a party without a trial, it is granted cautiously and sparingly, and only after carefully ascertaining that the moving party has met all the requirements for summary judgment. Associated Press v. United States, 326 U.S. 1, 6 (1945); Espinoza v. Commissioner, 78 T.C. 412, 416 (1982). Under Rule 121(b), summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." See Kroh v. Commissioner, 98 T.C. 383, 389 (1992). Summary judgment will not be used to resolve disagreements over factual issues. Northern Ind. Pub. Serv. Co. & Subs. v. Commissioner, supra at     (slip op. at 3); Shiosaki v. Commissioner, supra. *73 A summary judgment will be denied if there is any reasonable doubt as to the facts in issue. Hoeme v. Commissioner, 63 T.C. 18, 20 (1974) (citing 6 Moore, Federal Practice, par. 56.02[10], at 2045 (2d ed. 1948)). Factual inferences are viewed in the light most favorable to the party opposing the motion. Blanton v. Commissioner, 94 T.C. 491, 494 (1990). The moving party bears the burden of proving that there is no genuine issue of fact. Id. However, the party opposing summary judgment cannot rest upon mere allegations or denials set forth in that party's pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Rule 121(d); Marshall v. Commissioner, 85 T.C. 267, 271 (1985). The doctrine of collateral estoppel, or issue preclusion, is used to preclude a party and its privies from relitigating issues actually and necessarily litigated and decided in a final prior judgment by a court of competent jurisdiction. It applies to issues of fact, issues of law, and mixed issues of fact and law. Meier v. Commissioner, 91 T.C. 273, 282-283 (1988). *74 This Court has used the following three-pronged test for determining the application of collateral estoppel: First, whether the issues presented in the subsequent litigation are in substance the same as those in the first case; second, whether controlling facts or legal principles have changed significantly since the first judgment; and third, whether other special circumstances warrant an exception to the normal rules of preclusion. * * * [Meier v. Commissioner, 91 T.C. 273, 283 (1988) (citing Montana v. United States, 440 U.S. 147, 155 (1979)).]
In order for collateral estoppel to apply to an issue, the parties must have litigated the issue and a final judgment must have been rendered by a court of competent jurisdiction. Blanton v. Commissioner, supra at 495-496; Peck v. Commissioner, 90 T.C. 162, 166 (1988), affd. 904 F.2d 525 (9th Cir. 1990). Also, the nonmoving party must have had a full and fair opportunity to litigate the issue in the prior proceeding. Hudson v. Commissioner, 100 T.C. 590, 593 (1993). *75 A judgment of the bankruptcy court deciding the amount of tax liability owed is a final judgment. Florida Peach Corp. v. Commissioner, 90 T.C. 678, 682-683 (1988). The parties to litigation in which collateral estoppel is sought ordinarily must be parties to the prior litigation or their privies. Gammill v. Commissioner, 62 T.C. 607, 614 (1974); see also Kroh v. Commissioner, supra at 400. Collateral estoppel may not be invoked against the Government by one who was not a party to the prior proceeding. United States v. Mendoza, 464 U.S. 154 (1984); Black Constr. Corp. v. INS, 746 F.2d 503, 504 (9th Cir. 1984); McQuade v. Commissioner, 84 T.C. 137, 144-145 (1985). The record of the bankruptcy court's proceeding does not show that the estoppel facts were either litigated in or actually decided by the bankruptcy court. The record establishes only that the bankruptcy court had a hearing to determine the tax liability of J.P., the debts were discussed and did have an impact on the tax liability of *76 J.P., and the court determined J.P.'s tax liability based on the agreement of the parties. At the conclusion of the hearing, the Judge stated that there was no case or controversy. The order of the bankruptcy court determined J.P.'s tax liability as the amount agreed to by the parties. Nothing in the record establishes that the bankruptcy court decided that the debts were obtained through misrepresentation or that J.P. never intended to repay the debts. The only determination made by the bankruptcy court was the amount of J.P.'s tax liability, and the record shows that this determination was made because of the agreement of the parties and not as the result of a litigated issue. For collateral estoppel to apply, the issues sought to be precluded must have been actually determined in the prior proceeding. Montana v. United States, 440 U.S. 147, 153, 155 (1979). That has not happened in the present case. Therefore, we hold that the doctrine of collateral estoppel does not apply. The doctrine of res judicata, or claim preclusion, precludes a party to a suit and its privies from again litigating a cause of action on which a final judgment has been *77 entered on the merits by a court of competent jurisdiction. Meier v. Commissioner, 91 T.C. 273, 282 (1988). In order for res judicata to apply, the moving party must show that: (1) The cause of action in the prior case is the same cause of action as in the instant case, (2) petitioner qualifies as a party or a privy of a party in the prior case, and (3) there was a final judgment on the merits in the prior case. Commissioner v. Sunnen, 333 U.S. 591, 597 (1948); Kroh v. Commissioner, 98 T.C. at 398-399. The cause of action in the present case is not the same as the cause of action involved in J.P.'s bankruptcy proceeding. See Kroh v. Commissioner, supra at 399-400, where we held that a determination by a bankruptcy court of the husband's tax liability on a jointly filed tax return was a different cause of action than the determination of the wife's tax liability. Furthermore, as stated above, nothing in the record establishes that the bankruptcy court decided that the debts were obtained through misrepresentation or that J.P. never intended to repay the *78 debts. Therefore, we reject petitioners' res judicata arguments. The doctrine of judicial estoppel is an equitable doctrine which focuses on the relationship between a party and the courts, as distinguished from equitable estoppel, which focuses primarily on the relationship between the parties. In particular, judicial estoppel prevents a party from successfully asserting a position before a court which that court accepts and asserting a completely contradictory position before the same or another court merely because it is now in that party's interest to do so. Huddleston v. Commissioner, 100 T.C. 17, 26 (1993). Judicial estoppel, unlike collateral estoppel, does not require privity of the parties or detrimental reliance by the party seeking to invoke it. Id. We have recently held that judicial estoppel is available to use in appropriate cases. Id. at 28. However, it is to be applied with caution. Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990). Judicial estoppel requires acceptance by a court of the prior position. Huddleston v. Commissioner, supra at 26. *79 This means that the court must have adopted the position either as a preliminary matter or as part of a final disposition. Teledyne Indus., Inc. v. NLRB, supra at 1218. In the present case, petitioners have failed to establish precisely respondent's position in the bankruptcy case. The record shows that the factual basis of respondent's position was not the basis of the order of the bankruptcy court. Rather, the bankruptcy court approved an agreement of the parties as to J.P.'s tax liability. Petitioner BCII had a claim in the bankruptcy proceeding and could have contested the Trustee's agreement to J.P.'s tax liability but did not. Petitioner's claim was based on J.P.'s indebtedness to it. There were no admissions by respondent or findings of fact by the bankruptcy court and judicial estoppel cannot apply without such. Id. at 1219. Here there was apparently agreement of the parties as to the tax liability of J.P. and that agreement was accepted by the bankruptcy court, with the specific statement that no "adjudication" was being made since the court had no "case of controversy". There is no showing that the *80 examining agent's reason for the determination was accepted. Therefore, we hold that judicial estoppel does not apply in this case. In Teledyne Indus., Inc. v. NLRB, supra at 1219, the Court of Appeals for the Sixth Circuit stated: Teledyne relies on our decision in Reynolds v. Commissioner of Internal Revenue, 861 F.2d 469 (6th Cir. 1988), to assert judicial estoppel, but the differences between this case and Reynolds actually illustrate why judicial estoppel does not apply to the Board. Unlike Reynolds, the agreed orders in this case contain no admissions or findings of law or fact. In Reynolds, the issue was whether the petitioner or the petitioner's former spouse was liable for the tax on a certain capital gain. Id. at 470. The Commissioner of Internal Revenue admitted in a bankruptcy court-approved stipulation in the first case against the wife, that the wife was liable for the tax, implicitly exonerating the husband. Id. at 471-72. In this case, the Board and the Union negotiated settlement stipulations in which Wheeler and Stidham *81 did not admit that they had engaged in any misconduct under the Act. Judicial estoppel cannot apply without some decision or admission in the district court's agreed orders as to whether Stidham and Wheeler actually engaged in the alleged misconduct. NLRB v. Markle Mfg. Co., 623 F.2d 1122, 1126-27 (5th Cir. 1980). [6] In addition, the stipulation in Reynolds was approved by a bankruptcy court in a bankruptcy proceeding, where the court had a duty to ensure that the agreement was fair and equitable, unlike an ordinary civil case. Reynolds, 861 F.2d at 473; see also id. at 475 (Kennedy, J., dissenting) (arguing that even a settlement approved in bankruptcy court would not constitute judicial acceptance). * * *
Here the facts are comparable to those in Teledyne, Indus., Inc. v. NLRB, supra, rather than those in Reynolds v. Commissioner, 861 F.2d 469 (6th Cir. 1988), revg. T.C. Memo. 1987-261, except that the prior order in this case was of a bankruptcy court. However, the basis of the distinction *82 of a bankruptcy proceeding from an "ordinary civil case" made in Reynolds v. Commissioner, supra at 473, is that the approval by the bankruptcy court of a settlement which "approves a payment from the bankrupt estate" based on a party's assertion of a given position amounts to "judicial acceptance" of the position asserted. Here, a payment was made to the estate and, also here, there was no stipulation, written settlement agreement, or statement of position by the Government aside from an audit and testimony by a revenue agent. This stands in contrast to Reynolds, where the parties' stipulation, which was approved by the bankruptcy court, incorporated a schedule setting forth the "agreed income" of Mrs. Reynolds. In the instant case, the statements by and the order of the bankruptcy judge clearly show that he made no "adjudication", but rather merely accepted an agreement of the parties to which no creditor objected after being afforded ample opportunity to do so. This is clearly a distinction of this case from Reynolds v. Commissioner, supra, in which the Court of Appeals considered that the bankruptcy court made *83 an adjudication. We also point out that in Reynolds v. Commissioner, supra, the Court stressed the consideration of equities in determining judicial estoppel and concluded it was inequitable to tax the same capital gain to both husband and wife. There are no such equitable considerations in the instant case, since petitioners in this case have made and are prosecuting a claim in the bankruptcy court to recover loans made to J.P. which they argue the Government is estopped by judicial estoppel to contend were loans. In our view the opinion of the Court of Appeals in Reynolds v. Commissioner, supra, is clearly distinguishable from the instant case. However, it should be pointed out that an appeal in this case would be to the Court of Appeals for the Fifth Circuit absent agreement of the parties to the contrary. Based upon our conclusion that neither collateral estoppel, res judicata, nor judicial estoppel applies in this case, we hold that petitioners have failed to prove they are entitled to partial summary judgment as requested in this case. Since we have concluded that respondent is not estopped to deny the "estoppel *84 facts" because there was no adjudication by the bankruptcy court with respect to J.P.'s tax liability, but rather a settlement of the parties, it is unnecessary to discuss the other issues raised by respondent such as petitioner's privity to the parties in the bankruptcy case. An appropriate order will be issued denying petitioners' motion for partial summary judgment. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. We will also refer to the $ 4,450,000 debt as the $ 1,250,000 debt and the $ 3,200,000 debt. This is because $ 1,250,000 of the proceeds from the $ 4,450,000 debt was distributed by check to Mr. Kassahn, while the remaining $ 3,200,000 was distributed to him by a bank transfer. Yet, both the $ 1,250,000 debt and the $ 3,200,000 debt are evidenced by the $ 4,450,000 note. Also, the $ 4,450,000 debt and the $ 9,712,685.48 debt are collectively referred to as the debts.↩
1. Petitioners stated in their petition that this amount should have been $ 700,000.↩
3. Petitioners alleged in their petition that this amount should have been $ 40,533.↩
1. There is no explanation of the difference in this amount and the $ 61,368.65 deducted by petitioners as an accrued interest deduction.↩