In re MAXWELL NEWSPAPERS, INC., d/b/a Daily News, Debtor.

MIRROR GROUP NEWSPAPERS, PLC, MGN Limited, and RTI Holdings, Inc., Plaintiffs,

v.

MAXWELL NEWSPAPERS, INC., d/b/a Daily News, Defendant.

Bankruptcy No. 91 B 15531 (TLB). Adv. No. 93–8479A.

United States Bankruptcy Court, S.D. New York.

March 8, 1994.

Stroock & Stroock & Lavan by Brian M. Cogan and Mark S. Cheffo, New York City, for plaintiffs.

Jones, Day, Reavis & Pogue by Fredrick E. Sherman, Marc S. Kirschner and Kenneth R. Puhala, New York City, for debtor/defendant.

*MEMORANDUM DECISION ON OBJEC-TIONS TO PROOFS OF CLAIM FILED BY MIRROR GROUP NEWS-PAPER, PLC, MGN LIMITED AND RTI HOLDINGS, INC.*

TINA L. BROZMAN, Bankruptcy Judge.

We revisit, after trial, the request of Maxwell Newspapers, Inc. to expunge the proofs of claim filed by Mirror Group Newspapers, plc, and two of its subsidiaries, MGN Limited and RTI Holdings, Inc. I will refer to Maxwell Newspapers, Inc. as "Maxwell Newspapers" and to the latter group of companies as "MGN." Maxwell Newspapers did business and published a newspaper known as the "Daily News." MGN, which consists of corporations all of which are affiliates of Maxwell Newspapers, alleges that prior to its bankruptcy Maxwell Newspapers stole from the group some $92 million. No one disputes the loss that MGN suffered, only whether Maxwell Newspapers, and through it, its creditors, ought to be held accountable. The parties agree that resolution of their dispute turns on whether I should impute to Maxwell

Newspapers the conduct of the late Robert Maxwell, who for a period of time controlled Maxwell Newspapers as well as MGN, and of his son Kevin. Earlier, Maxwell Newspapers unsuccessfully sought summary judgment granting the same relief, expungement of MGN's proofs of claim. *In re Maxwell Newspapers, Inc.*, 151 B.R. 63 (Bankr. S.D.N.Y.1993). Because of the complexity of the claims asserted by MGN, I directed it to replead its proofs of claim as a complaint commencing an adversary proceeding. That done, I tried the dispute on August 2, 1993, after which the parties submitted posttrial memoranda of law.

## I.

## THE PURCHASE OF THE NEWSPAPER AND MAXWELL'S SWEEP OF $65 MILLION

From their inception, Robert Maxwell's dealings with the Daily News were unusual, for he did not pay anything to acquire the tabloid. Rather, his corporate vehicle assumed liabilities and accepted a large sum of money, approximately $65 million (the "Tribune proceeds"), from the Tribune Company to take the newspaper off its hands. This was accomplished pursuant to an Asset Purchase Agreement dated March 14, 1991, among Maxwell Newspapers, Mirror Group, plc, the Tribune Company and New York News, Inc. ("New York News").[1] At the time of its acquisition, the Daily News was in financial strife, having suffered the crippling effects of a five-month strike which saw advertising revenues and circulation plummet. So severe was the Daily News' financial con-dition that the Tribune Company earlier had announced its intention to cease publication of the newspaper if a buyer could not be found within sixty days. It was during the interval between the sounding of the death knell and execution that Robert Maxwell agreed to acquire the Daily News through Maxwell Newspapers, a corporation of which he was the ultimate owner.[2] Once the acquisition had closed, Maxwell installed himself immediately as chairman of the board of directors of Maxwell Newspapers. (Indeed, from the acquisition of the Daily News until one month after Robert Maxwell's death in November, 1991, the Maxwell family dominated Maxwell Newspapers' board of directors and exercised complete control over the newspaper.)

Among the obligations of the Daily News which Maxwell Newspapers assumed were buyout and severance payments to employees who were unnecessary or even counterproductive to the success of the continuing operation. The payments from the Tribune Company were made to Maxwell Newspapers, the entity which had assumed the Daily News' liabilities. Yet the ink had not dried on the closing documents when Robert Maxwell shuttled all but $16,000 of the $60.016 million initially paid to Maxwell Newspapers out of Maxwell Newspapers' reach and into the account of another entity which he controlled, Pergamon Holdings Ltd., U.K. *See* PX–7.[3] Later, in like manner, Maxwell seized the roughly $5 million balance of the Tribune proceeds within days of their receipt by Maxwell Newspapers. Tr. at 133.

1. That amount was made up of two components, a lump sum payment of $60,016,000 at the March 21, 1991 closing and a $5,713,680 working capital adjustment paid four months later.

2. Maxwell had an empire of many hundreds of corporations some of which, like MGN, were owned, directly or indirectly, in part by the Maxwell family and in part by the investing public and others of which, like Maxwell Newspapers, were owned wholly by the Maxwell family, directly or indirectly. The "private-side" companies owned by the Maxwell family are believed to be headed by Headington Investments, Ltd. ("Headington") which is in administration proceedings in London and has an ancillary bankruptcy case pending here. The "public-side" companies are headed by Maxwell Communication Corporation plc, which is owned publicly and in minority part by Headington. Maxwell Communication Corporation plc had simultaneous administration proceedings and a chapter 11 case pending in London and New York City, respectively. A substantial number of the shares of Mirror Group Newspapers plc (the parent company in the MGN chain which filed claims against Maxwell Newspapers) is owned by Headington, which, in turn, is owned by the Maxwell family.

3. "PX" and "DX" refer to plaintiffs' and defendant's trial exhibits, respectively, "Tr." to the August 2, 1993 trial transcript, and "PTO" to the parties' joint pretrial order.

## MAXWELL CHANGES THE NEWSPAPER'S FINANCIAL PRACTICES

Under Tribune ownership, the Daily News had not maintained any of its own bank accounts; instead, its treasury functions were coordinated through the Tribune Company's central banking system. PX–25 at 7. That practice changed somewhat under Robert Maxwell's ownership. Maxwell turned over management of the newspaper's daily cash needs to Marshall Genger, its controller. Maxwell then instructed Genger and Kathleen Guinessey, the treasurer of Macmillan, Inc. (the well-known publisher which was yet another Maxwell-controlled entity), to set up three accounts in Maxwell Newspapers' name. They did so, opening at Chase Manhattan Bank an operating account, a payroll account and a disbursement account. The transfers giving rise to this litigation passed through the operating account, which I will dub the "Chase account". At Maxwell's direction Guinessey also opened an account in the name of Maxwell Newspapers at National Westminster Bank ·USA (the "NatWest account"), as well as lock box accounts at Nebanco, Continental and Mellon banks. It was the Natwest account into which the Tribune proceeds were deposited. Tr. at 62. Robert Maxwell was definitely a signatory to the Natwest account; Guinessey may have been a signatory as well. At the time of the initial $60.016 million deposit, neither Genger nor Maxwell Newspapers' chief financial officer knew that the Natwest account had been established in Maxwell Newspapers' name. Genger only learned of that fact in the late spring or early summer of 1991 and informed the chief financial officer of it. Tr. at 62–79; PX–22 at 56–59.

## DOLING BACK TO MAXWELL NEWSPAPERS BITS OF THE $65 MILLION

The Daily News' operations were funded in part by the revenues Maxwell Newspapers derived from advertising and circulation. Those revenues, however, often fell short of what Maxwell Newspapers needed. When Maxwell Newspapers requested additional capital, Genger prepared a projected cash forecast and presented that forecast to either Robert or Kevin Maxwell. Once either had approved the request, Genger would fax that approval to Maxwell's London treasury (which acted as a centralized cash manager for his entities), where individuals there would handle the release of funds to Maxwell Newspapers. Tr. at 56–59. In effect, they were doling back to Maxwell Newspapers bits of the $65 million which Robert Maxwell took from it. Tr. at 133–37. As late as October 1991, Maxwell Newspapers was still owed some $4,000,000 out of the Tribune proceeds.[4] Eventually, the Tribune proceeds were returned in full and Maxwell Newspapers received an additional $6.7 million.

## THE FRAUDULENT SCHEME

At all times until his death, Robert Maxwell had authority to transfer funds into or out of all Maxwell Newspapers' bank accounts. This enabled him, aided by his son and certain of his London staff, to use the bank accounts over the course of the eight or nine months after he acquired the Daily News to effect transfers of misappropriated funds of various Maxwell-controlled entities, including MGN. This is not to suggest that the misappropriated funds were diverted to Maxwell Newspapers for its use. Rather, for the most part, the funds rested with Maxwell Newspapers only long enough for them to be transferred to a variety of other destinations. Between March and November, 1991, some $238 million was transferred into the Maxwell Newspapers accounts, most of which was promptly transferred out.

## THE MAY 1991 BANKERS TRUST LOAN TO ROBERT MAXWELL GROUP

The seeds giving rise to this particular litigation were sown in May 1991, when

---

4. MGN would have me find that Maxwell Newspapers had received back all of the Tribune proceeds at the time of the October transactions. In support, MGN points to a highly ambiguous statement in a report prepared by Salomon Brothers, Inc. as a marketing tool for the sale of the newspaper. The statement was to the effect that by October 1991 the Tribune proceeds had been exhausted. What Salomon Brothers, Inc. does not state is whether the proceeds had been exhausted by Maxwell Newspapers. Thus, the report cannot be said truly to be inconsistent with the testimony of Marshall Genger, who stated clearly and unambiguously that as of October, Maxwell Newspapers was still owed about $4,000,000 from the rest of the Maxwell entities. I find the facts to be as Genger stated.

Bankers Trust Company ("Bankers Trust") loaned the Robert Maxwell Group, plc ("RMG"), another Maxwell-controlled entity, £50 million. In an internal office memorandum, Bankers Trust had noted that $30 million of the RMG loan proceeds would be used by RMG to purchase property for Maxwell Newspapers and that $8.7 million more would be used to satisfy Maxwell Newspapers' cash flow requirements. PX–36. Despite the intentions imparted to Bankers Trust, most of the proceeds of the RMG loan never made it into Maxwell Newspapers' coffers; however, RMG did make a series of transfers aggregating $8.45 million to Maxwell Newspapers in the weeks following consummation of the RMG loan.[5] But at this time, Maxwell Newspapers had not received back all of the $60 million in initial Tribune proceeds. (The $5.7 million working capital adjustment was not paid by the Tribune Company to Maxwell Newspapers until July 1991).

## THE OCTOBER 1991 BANKERS TRUST LOAN TO MGN

The particular misappropriation by the Maxwells[6] which underlies MGN's claims began on October 18, 1991. On that day, Robert telephoned Larry Bloom, Maxwell Newspapers' chief financial officer, to discuss certain transfers into and out of Maxwell Newspapers' Chase account which he wanted Bloom to carry out over the next several days. Maxwell instructed Bloom that approximately $86 million would be transferred into Maxwell Newspapers' Chase account and that the majority would be promptly transferred out, with the residue remaining for Maxwell Newspapers' operating needs. Bloom told Maxwell that, in Bloom's absence, Genger could carry out Maxwell's instructions. Maxwell agreed. Bloom then called

Genger to advise him of the impending transactions.

Three days later, on Monday, October 21, 1991, Kevin Maxwell telephoned Genger to let him know that $164 million would be transferred into the Chase account that day, a considerable amount more than the $86 million Genger had anticipated. Tr. at 100–01. Kevin directed Genger to transfer $86 million of the sum to be received to Bankers Trust. At this juncture, Kevin neither furnished nor was asked for any explanation. Consistent with his father's remarks to Bloom, Kevin mentioned that when these transfers were complete, between $9 million and $10 million would remain for Maxwell Newspapers' operations. This comment provided Genger with some measure of comfort, because, at that time, Maxwell Newspapers was strapped for cash, owing several million dollars to its suppliers. So precarious was Maxwell Newspapers' cash position that one newsprint supplier, whose product was essential to publication of the newspaper, had just cut off delivery. Tr. at 107–08.

Notwithstanding Kevin's earlier representations to Genger, only $86 million was transferred into Maxwell Newspapers' account on October 21. This concerned Genger and prompted him to call Kevin. Kevin explained that there had been an administrative error and that Maxwell Newspapers would receive the balance of the $164 million the following day. Tr. at 103. Recognizing that Maxwell Newspapers had received only a portion of the funds originally anticipated, Kevin modified his previous instructions, now directing Genger to transfer only $56 million to Bankers Trust, instead of the $86 million originally contemplated. Kevin explained the $86 million which Maxwell Newspapers had received as constituting the proceeds of his father's sale of shares in Scitex Corpora-

---

**5.** RMG transferred to Maxwell Newspapers the following amounts:

| Date | Amount (in millions) |
|------|------|
| 5/31 | $1.70 |
| 6/12 | $2.70 |
| 6/19 | $2.05 |
| 7/03 | $2.00 |

*See* DX–N.

**6.** For a discussion of why I have focused on the conduct of the Maxwells rather than solely on Robert Maxwell's conduct, *see* infra note 11.

tion ("Scitex"). Tr. at 113–14. That representation proved false. In reality, the funds were the proceeds of a £50 million working capital loan given by Bankers Trust to MGN Limited, which loan had been negotiated on behalf of MGN by Robert Maxwell, Kevin Maxwell and Michael Stoney (an MGN director).[7] *See* DX–B at 11. Bankers Trust had loaned MGN the funds on October 21, the same day that the RMG loan given by Bankers Trust was to be repaid. The trio had told Bankers Trust a variation of the same tale that Kevin told Genger, namely, that the RMG loan was to be repaid from Maxwell's sale of his shares in Scitex. DX–B at 11; PX–35 at 178.[8] As the parties would later discover, Robert Maxwell sent the funds off in a great circular ride. He took the proceeds of the $86 million MGN loan from Bankers Trust, filtered those funds through the Chase account and then transferred them back to Bankers Trust in repayment of the May 1991 Bankers Trust loan to RMG.

Over the four days in October that Maxwell Newspapers' counsel later named the "conduit transfer" days, Genger, acting on Robert's and Kevin's instructions, transferred the following amounts into and out of Maxwell Newspapers' account[9]:

TRANSFERS IN:

| DATE | AMOUNT |
| --- | --- |
| 10/21 | $ 86,105,000.00 |
| 10/22 | $ 22,000,000.00 |
| 10/23 | $ 2,200,000.00 |
| 10/23 | $ 1,700,000.00 |
| 10/24 | $ 1,000,000.00 |
| Total | $113,005,000.00 |

TRANSFERS OUT:

| DATE | AMOUNT |
| --- | --- |
| 10/21 | $ 55,786,352.25 |
| 10/21 | $ 8,818,673.21 |
| 10/22 | $ 6,246.56 |
| 10/22 | $ 21,000,000.00 |
| 10/22 | $ 17,770,560.00 |
| 10/23 | $ 9,000,000.00 |
| 10/24 | $ 1,000,000.00 |
| Total | $113,381,832.02 |

In carrying out these transfers, Genger followed Robert's and Kevin's instructions to the letter, believing he had no discretion as to how the funds could be disbursed. Tr. at 90–91. Genger later explained the basis for his belief:

> It was really a question of the funds were theirs, the accounts were theirs and they were signatories to all our accounts. They had free access to do whatever they wanted.

Tr. at 111. To understand Genger's state of mind, one must remember that Genger believed these funds were *not* Maxwell Newspapers' funds, but the proceeds of the Scitex sale some $9 to $10 million of which would be made available to Maxwell Newspapers for its operational purposes. Tr. at 108; PX–22 at 110–11; PX–25 at 60.

Genger's expectation was never realized. Instead, as a result of those four days of transfers, Maxwell Newspapers had given approximately $376,000 more than it had received. When Bloom subsequently asked Kevin how this $376,000 net loss should be treated on the company's books, Kevin said that it ought to be charged to the intercompany debt account reflecting monies owing from RMG to Maxwell Newspapers.

MGN attributes its losses to collusion among a group of individuals but has publicly

---

**7.** In order to complete the documentation for the Bankers Trust loan to MGN, Stoney had presented Bankers Trust with certificates, signed by Robert Maxwell, showing that MGN's board of directors had approved the loan. DX–B at 11. Mr. Stephens, MGN's corporate secretary, aided Robert Maxwell and Stoney in this scheme. DX–F at 101–02. Kevin had conducted the negotiations between Bankers Trust and MGN notwithstanding that Kevin was neither an officer nor director of MGN. DX–B at 11; PX–32 at 35. Bankers Trust believed him to be acting and speaking with his father's authority. PX–35 at 172–75.

**8.** As Moore would later recount, he thought Bankers Trust was making a legitimate working capital loan to MGN Limited. PX–35 at 179–93.

**9.** The twelve transfers are summarized in a document created by Genger and approved by Kevin subsequent to Robert Maxwell's untimely death. DX–A.

acknowledged weaknesses which may have played a part in the diversion of MGN's funds. They include: internal controls and operating procedures which failed to identify related-party transactions and bring them to the attention of the independent directors for their approval; funds transfers permitted on the authority of Robert Maxwell alone or of other directors who were also directors of other Maxwell-controlled companies without the audit committee (consisting of non-executive directors) having been convened; inadequate authority of the finance department to verify and record the activities carried out by the treasury department; and the resultant lack of proper documentation relating to these activities which would have enabled the keeping of proper books of account. *See* DX-B.

## THE RTI HOLDINGS TRANSFER

The Maxwells' shuffling of funds into and out of the Chase account did not end with the Bankers Trust loan to MGN. During that same four day span in October, Kevin Maxwell directed Genger to have transferred to Maxwell Newspapers $1.7 million that Kevin said was being held for it by RTI Holdings, Inc. ("RTI"), a wholly-owned subsidiary of Mirror Group Newspapers, plc. Tr. at 125–26. Acting in accordance with those instructions, Genger related Kevin's directive to Dick Yeager, RTI's controller. Yeager complied. After Maxwell Newspapers received that money, Kevin instructed Genger to transfer the full amount to Bankers Trust. *Id.* Genger did not think that the RTI transfer was a loan to Maxwell Newspapers nor did he believe these funds to belong to it; he considered the transfer just another of the conduit transactions that had consumed his time during the previous four days. *Id.* at 127. However, based on what he perceived

as directions from Maxwell personnel in London, Genger carried this $1.7 million transfer on Maxwell Newspapers' books as a debit in favor of RTI through December 5, 1991, the date Maxwell Newspapers filed its chapter 11 petition. Tr. at 127–30; PX–12–17. After the chapter 11 petition was filed, Genger deleted the RTI debit from the Maxwell Newspapers daily cash summaries, Tr. at 131; PX–17, because, he said,

> [a]s we [delved] deeper into some of the things going on and some of the transactions we didn't understand like the ones that occurred early in March, we realized the things that we had been told to portray were very gross simplifications. They were not accurate because there was lots of other transactions that had not been recorded on either side's part and we didn't have the full picture, which is one of the reasons why we had Coopers [ & Lybrand] come in.

Tr. at 150.

MGN has filed two proofs of claim, one for $90,549,524.63 plus interest, the other for $1,700,000 plus interest. The debtor, joined by its Official Committee of Unsecured Creditors, objected to MGN's claims and sought to expunge them by way of summary judgment, which, as I mentioned above, was a request that I denied.

## II.

The legal theories have not changed much since I denied summary judgment.[10] Both sides agree that the overarching question is whether the conduct of the Maxwells, who at all times after Robert purchased the Daily News through the date of his death, dominated and controlled both Maxwell Newspapers and MGN, can be imputed to either or both of them.[11] If the Maxwells' conduct cannot be imputed to Maxwell Newspapers, my inquiry ends. If, however, the Maxwells' con-

---

10. One addition is that Maxwell Newspapers now suggests that even if MGN's claims are allowed, they ought be equitably subordinated to the claims of the debtor's general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code, because MGN is an insider controlled by the same individual who controlled Maxwell Newspapers.

11. This discussion presupposes that both Robert and Kevin can be considered agents of both Maxwell Newspapers and Mirror Group. There is no question but that Robert was an agent of Maxwell Newspapers. The same may be said of his relationship with MGN, given that, until his death, Robert served as Mirror Group's Chairman and sat on its board of directors. DX–B at

duct can be imputed to Maxwell Newspapers, I then must consider several other issues raised by Maxwell Newspapers; specifically, (1) whether to borrow the concepts of "mere conduit" and "earmarking" from preference and fraudulent transfer law to insulate Maxwell Newspapers from MGN's claims; (2) whether the Maxwells' conduct may be imputed to MGN and, if so, whether the doctrines of *in pari delicto*, unclean hands and equitable estoppel would bar MGN's claims; and (3) whether MGN's claims should be equitably subordinated. We begin, then, with whether the debtor should be charged with the acts of the Maxwells.

■■■ Under fundamental principles of New York agency law,[12] the acts and knowledge of an agent acting within the scope of his agency are imputed to the agent's principal. *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784, 497 N.Y.S.2d 898, 899, 488 N.E.2d 828, 829 (1985). The principal is also liable for the agent's misrepresentations that cause pecuniary loss to third parties when the agent acts within the scope of his apparent authority. *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982); *Maritime Ventures Intern., Inc. v. Caribbean Trading & Fidelity, Ltd.*, 689 F.Supp. 1340, 1355 (S.D.N.Y.1988). In the case of a corporation, which can act only through its agents, the rule is that the actions of corporate directors and officers are attributable to the corporate entity. *Tew v. Chase Manhattan Bank*, 728 F.Supp. 1551, 1559 (S.D.Fla.), *amended in part*, 741 F.Supp. 220 (S.D.Fla.1990).

■■■ To this hornbook principle there are an exception[13] and an exception to the exception. Under the "adverse interest exception," when an agent's motive and conduct demonstrate that he has totally abandoned his principal's interest and is acting to defraud his principal, entirely for his own or another's purpose, his knowledge and misconduct will not be imputed to his principal. *In re Drexel Burnham Lambert Group, Inc.*, 148 B.R. 1002, 1005 n. 2 (S.D.N.Y.1993); *In re Crazy Eddie Securities Litigation*, 802 F.Supp. 804 (E.D.N.Y.1992); *In re Wedtech Securities Litigation*, 138 B.R. 5, 9 (S.D.N.Y. 1992) (*Wedtech II*); *Center*, 66 N.Y.2d at 784, 497 N.Y.S.2d at 899–900, 488 N.E.2d at 829–830. The rationale for this exception is clear; the law does not presume that the wrongdoer would perform his usual duty of disclosing all material facts regarding his action if such disclosure would reveal his fraud. *Tew*, 728 F.Supp. at 1559. The exception is also applicable where the agent is engaged in prosecuting some fraudulent or illegal enterprise, the success of which would be impaired or defeated by the disclosure to his principal of the notice or knowledge sought to be imputed. 3 Am.Jur.2d, *Agency* ¶ 290 (1986).

43. The disagreement lies in whether Kevin ought be considered an agent of either company or both. Kevin was not an officer or director of Mirror Group from April through November 1991. DX–B at 6–7; DX–F at 48. Nor was Kevin an officer or director of Maxwell Newspapers until after November 6, 1991. Tr. 138. However, officers of MGN, Bankers Trust (which negotiated the MGN loan) and Maxwell Newspapers each acted under the assumption that Kevin spoke for his father, with his father's authority, based on their prior dealings with him. *See* PX–23 at 47–50; PX–35 at 173; Tr. at 138–39.

"Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as an agent for the other, arising from and in accordance with the other's manifestations to such third persons." Restatement (Second) of Agency § 8 (1957). Here, whether Kevin had apparent authority to act on behalf of Maxwell Newspapers and MGN (although the evidence suggests that he did) is an issue I need not reach. For even assuming (as MGN urges) that he was an agent, as will become clear, that does not alter the outcome of this dispute. Moreover, it is senseless for MGN to argue that it relied on Kevin's apparent authority and would not have complied had it known of the Maxwells' intent, for Robert Maxwell controlled MGN just as he controlled Maxwell Newspapers.

12. The parties agree that New York law controls.

13. There is another, related limitation to this exception to general agency imputation. If the agent is the sole representative of the principal, the agent's knowledge will be imputed to his principal. 3 N.Y.Jur.2d, *Agency* ¶ 268 (1980). However, this limitation is inapplicable here given that both Maxwell Newspapers and MGN had more than one agent.

■ As the New York Court of Appeals has noted, "[t]o come within the adverse interest exception, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purpose. It cannot be invoked merely because [the agent] has a conflict or because he is not acting primarily for his principal." *Center*, 66 N.Y.2d at 784–85, 497 N.Y.S.2d at 900, 488 N.E.2d at 830; *accord Crazy Eddie*, 802 F.Supp. at 817; *In re Investors Funding Corporation Securities Litigation*, 523 F.Supp. 533, 541 (S.D.N.Y.1980); *In re Wedtech Corp.*, 81 B.R. 240 (S.D.N.Y.1987) (*Wedtech I* ). That is, the exception is not applicable when the agent acts both for the principal and himself, though his primary interest is inimical to that of his principal. *Crazy Eddie*, 802 F.Supp. at 817, *citing Investors Funding*, 523 F.Supp. at 541 and *Wedtech I*, 81 B.R. 240.[14] The treatises and cases dealing with the adverse interest exception focus attention on the agent's motivation, conduct and dealings in determining whether a clear presumption has been raised that the agent would not communicate to his principal the facts in controversy. *See, e.g., Crazy Eddie*, 802 F.Supp. at 818; *Drexel*, 148 B.R. at 1006 n. 6; *Wedtech I*, 81 B.R. at 242; *First National Bank of Cicero v. U.S.*, 625 F.Supp. 926, 932 (N.D.Ill.1986), *aff'd after reconsideration*, 860 F.2d 1407 (7th Cir.1988); *Investors Funding*, 523 F.Supp. at 541; *Pan American Airways, Inc. v. Continental Bank*, 435 F.Supp. 642, 651 n. 7 (E.D.Pa. 1977); 3 N.Y.Jur.2d, *Agency* § 290 (1986).

■ The exception to the adverse interest exception brings back into general agency concepts what the adverse interest exception removes. This "double exception" provides that even if the agent has acted adversely to the principal, the principal may not accept the fruits of the agent's fraud and then attempt to divorce himself from the agent by repudiating the agent and his knowledge. As the Tenth Circuit so aptly put it,

If the principal disclaims the agent's acts as unauthorized, he has no grounds to retain the fruits thereof; on the other hand, if he retains the fruits of the agent's acts, after knowledge of the facts, he must in fairness be charged with the agent's knowledge.

*Maryland Casualty Co. v. Queenan*, 89 F.2d 155, 157 (10th Cir.1937); *accord Drexel*, 148 B.R. 1006 n. 2; *Investors Funding*, 523 F.Supp. at 541; *Cicero*, 625 F.Supp. at 932, *citing, among others, Monroe v. Harriman*, 85 F.2d 493, 495 (2d Cir.), *cert. denied*, 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); *Zanoni v. 855 Holding Co., Inc.*, 96 A.D.2d 860, 465 N.Y.S.2d 763, 764 (2d Dep't 1983), *aff'd*, 62 N.Y.2d 963, 479 N.Y.S.2d 341, 468 N.E.2d 296 (1984); *Marine Midland Bank v. John E. Russo Produce Co., Inc.*, 50 N.Y.2d 31, 44, 427 N.Y.S.2d 961, 968, 405 N.E.2d 205, 211 (1980), citing *Rockey River Development Co. v. German American Brewing Co.*, 193 A.D. 197, 202, 184 N.Y.S. 155 (4th Dep't 1920); 3 Am.Jur.2d, *Agency* § 194–95 (1986); 3 N.Y.Jur.2d, *Agency* § 268 (1980) (each applying this "fruit of the fraud" exception to adverse interest exception where principal retains fruits of the fraud); *accord U.S. v. 141st Street Corp. By Hersh*, 911 F.2d 870, 876 (2d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991) (implied application of this doctrine); *cf.* Restatement (Second) *Agency* § 282 (1984), Comment h (applying principles of restitution to declare that if the principal receives a benefit as a result of the conduct of the agent, he cannot keep the benefit and escape responsibility for the means by which it was required. Unless the principal returns that which he has retained as a result of the fraud, he will be unjustly enriched). As the court in *Rockey River* recognized, if the principal, after knowledge of all the material facts, does not make restitution and return the fruits of the fraud within a reasonable time, but instead retains the benefits of the agent's acts, the principal will be deemed to have ratified the agent's acts. 193 A.D.2d at

---

14. This principle is applied to a debtor-in-possession, because it is subject to all claims and defenses which might have been asserted against the debtor before bankruptcy (except where it is asserting the claims of creditors under the various avoiding powers contained in the Bankruptcy Code). *Miller v. New York Produce Exchange*, 550 F.2d 762, 768 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977); *Wedtech II*, 138 B.R. at 8–9.

201, 184 N.Y.S. 155; *accord* 3 Am.Jur.2d, *Agency* § 196 (1986).[15]

■ With these principles in mind, I turn to the facts as developed. The record demonstrates that from the outset the Maxwells' motivation was to further their own interests, not those of Maxwell Newspapers. Robert Maxwell assumed indirect ownership and control of the Daily News on March 14, 1991, when the newspaper was in serious financial straits, having just emerged from the devastating strike which had caused circulation and advertising revenue to plummet. The asset purchase agreement pursuant to which Maxwell Newspapers acquired the Daily News provided that an initial $60.016 million was to be paid to Maxwell Newspapers to assuage its financial ills. But instead of injecting this sorely-needed capital into Maxwell Newspapers, as the asset purchase agreement contemplated, Robert Maxwell immediately transferred all but $16,000 of it to Pergamon Holdings Ltd., U.K.. *See* DX–N. (That Robert Maxwell deposited the initial Tribune proceeds into the Natwest account, an account which Genger did not even know belonged to Maxwell Newspapers, only underscores Maxwell's state of mind.) Hence, Maxwell Newspapers was $60 million "in the hole" from the first day of Robert Maxwell's reign and remained in a negative cash position relative to the other Maxwell-related entities through the conclusion of the October transactions.

The Maxwells' conduct during the four days in October bolsters the conclusion that they were acting adversely to the interests of Maxwell Newspapers. When Kevin Maxwell called Genger on October 21 to describe the impending transfers, Kevin noted that, when all was said and done, between $9 and $10 million would remain in Maxwell Newspapers' account for its operational needs, which included almost that amount of debt for newsprint and other supplies. Help was critical, for one newsprint supplier had already cut off delivery; without newsprint, the Daily News could not be published. But when the conduit transactions were accomplished, the Maxwells left no residue with Maxwell Newspapers. They had actually deprived the entity of some $376,000. Nothing could paint a clearer picture of the Maxwells' cavalier disregard for Maxwell Newspapers than that action.

■ Moreover, the four days of transfers into and out of Maxwell Newspapers' account did not indirectly benefit Maxwell Newspapers. None of the transfers paid a Maxwell Newspapers debt, or purchased goods or services for the newspaper. The funds were not placed in interest-bearing accounts, nor were they invested overnight. What Maxwell Newspapers may have saved in reduced bank fees (which fees were tied to the average daily balances in the Chase account and normally ranged from $10,000–$12,000 per month) was more than offset by the $376,000 loss which Maxwell Newspapers sustained for the privilege of transferring MGN's monies.[16]

MGN tries to escape the consequences of the harm to Maxwell Newspapers by pointing to the facts that (i) between March 1991 and December 1991, the Daily News' advertising and circulation revenue increased and (ii) when all of the transfers between March and December 1991 were completed, Maxwell Newspapers was left with nearly $6.7 million in net funding. The bottom line, however, is that when one looks to October 1991 (the period during which the Maxwells defrauded MGN), Maxwell Newspapers was

---

15. As I will discuss *infra*, in order to have a ratification effected by receipt of benefits, the benefits received by the principal must have been certain, direct, and the proximate result of the unauthorized transaction. 3 Am.Jur.2d *Agency*, § 194 (1986).

16. MGN's argument that the Maxwells' fraud benefited Maxwell Newspaper simply by keeping the newspaper alive is also without merit. As Judge Conner recognized in *Investors Funding*, a corporation is not a biological entity for which it can be presumed that any act which extends its existence is beneficial. That prolonged existence benefits the unfaithful agent and the agent's confederates, not the corporation. 523 F.Supp. at 541. Whereas MGN correctly asserts that no case has applied the Investor's Funding rationale to a corporation which was not liquidated, here, the debtor most certainly was liquidated. The newspaper was sold but the debtor was forced to give up its ownership and liquidate for the benefit of its creditors, who will be receiving payment of only a small percentage of their debt.

still in a negative cash position. Thus, the net funding that it received by the end of the Maxwells' tenure [17] cannot have been a transfer of MGN's funds. Moreover, from mid-March 1991 (when Maxwell acquired the Daily News) through November 1991 (the last full month before it filed its bankruptcy petition) the newspaper sustained an operating loss in the neighborhood of $35,967,000. PX–1 at 10. One hardly can characterize Maxwell Newspapers as a flourishing enterprise restored to health by the Maxwells, as MGN suggests. The Maxwells were doing no more than keeping the enterprise perched at the brink of disaster.

The fraud which the Maxwells committed was one against Maxwell Newspapers, not on its behalf. *See Cenco, Inc. v. Seidman & Seidman,* 686 F.2d 449 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *accord FDIC v. Shrader & York,* 991 F.2d 216, 224 (5th Cir.1993). In *Cenco,* the Seventh Circuit explained that

> [f]raud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud ... [t]he primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud ...

686 F.2d at 456.[18] Judge Nickerson, writing in *Crazy Eddie,* echoed those sentiments, noting

> If the fraud committed by Crazy Eddie's top officers was on behalf of the corpora-

tion, their knowledge and actions are deemed those of the corporation. The corporation may not escape responsibility for a fraud the primary cost of which was borne not by stockholders but by outsiders.

802 F.Supp. at 817, citing *Cenco,* 686 F.2d at 456.

The evidence here compels the conclusion that the Maxwells' interest, both in purchasing and operating the Daily News, was to keep the newspaper alive so that Maxwell Newspapers could function as a money-laundering device through which Robert and his confederates could siphon funds to and from Maxwell-controlled private side and public side entities in furtherance of their own private agendas. *Center,* 66 N.Y.2d at 784–85, 497 N.Y.S.2d at 900, 488 N.E.2d at 829. The promises Robert and Kevin made to Genger to provide residual funds for Maxwell Newspapers' operations were lies, just as their statement that the source of the money was the sale of the Scitex shares was a lie, made merely to mollify Genger and induce his unknowing cooperation in their siphoning scheme. Father and son engaged in an elaborate ruse vis-a-vis Maxwell Newspapers, concealing the source of the money and what they intended to do with it, and concealing their intent to strip Maxwell Newspapers of still more money at a time when its ability to publish was in jeopardy. As Genger testified, it was only after the bankruptcy that Maxwell Newspapers began to surmise that what its books and records reflected with regard to these and other extraordinary transactions was far from accurate. The Maxwells lied to Maxwell Newspapers, lied to Bankers Trust, presented Bankers Trust with forged corporate minutes of MGN and betrayed MGN. But they did not do any of this with the intent to benefit Maxwell News-

---

17. Kevin Maxwell resigned his position as an officer and director of Maxwell Newspapers on January 1, 1992. *See* DX–L.

18. In *Cenco,* the court imputed the knowledge of the top managers to the corporation because fraud was committed on behalf of the corporation, even though when the fraud was unmasked, Cenco's market price plummeted by more than 75%. 686 F.2d at 456. There, the fraud involved inflating inventory far above actual value

which increased the apparent worth of the corporation and greatly increased the market price of its stock, allowing use of the inflated stock to buy up other companies on the cheap, allowing the corporation to borrow money at lower rates than would otherwise have been obtainable and causing insurers to pay inflated claims for inventory lost or destroyed. No such aggrandizement of Maxwell Newspapers occurred.

870

papers. Their conduct throughout their tenure harmed, not helped, Maxwell Newspapers, just as it harmed MGN.[19]

 Looking at this scheme from its inception through the end of MGN's involvement in it, Maxwell Newspapers derived no benefit and retained no fruit of the Maxwells' fraud. While it is true that as of the petition date, Maxwell Newspapers had received an infusion of $6.7 million over and above the return of the principal of the Tribune proceeds, that money was not MGN's, nor was it shown to have been fraudulently obtained. In any event, Maxwell Newspapers was still incurring staggering operating losses under the auspices of the Maxwells.[20] Moreover, the Maxwells plainly did not save Maxwell Newspapers as MGN suggests. Maxwell Newspapers lost its ownership of the Daily News and has been liquidated.

### III.

In sum, I find that the adverse interest exception is applicable here and precludes imputing the Maxwells' conduct to Maxwell Newspapers. Having reached this conclusion, I need not determine whether Maxwell Newspapers' earmarking, mere conduit, *in pari delicto*, unclean hands, and equitable estoppel arguments are applicable to enable

Maxwell Newspapers to evade liability. Nor need I determine whether MGN's claims should be equitably subordinated, relief which was sought for the first time in a footnote in a brief submitted by Maxwell Newspapers. SETTLE ORDER consistent with this decision.

---

**19.** As Judge Nickerson noted in *Crazy Eddie:*

Peat Marwick refers this court to the evidence that the Antars and others schemed to inflate the price of Crazy Eddie shares and to mislead investors about the company's financial condition in order to ensure the success of public offerings, the infusion of funds into Crazy Eddie, and the enrichment of the corporation and its shareholders, including of course the Antars themselves.

At trial Peat Marwick may persuade the jury that the Antars acted in part for Crazy Eddie's benefit. But the evidence now is certainly susceptible of the interpretation that any short term benefit to Crazy Eddie was intended to redound to the advantage of only the Antars and their conspirators.

The fact that some of the embezzled money was put back into the corporation to help inflate sales and facilitate public offerings is not inconsistent with an abandonment by the Antar Management of the corporation's interest. 802 F.Supp. at 818.

**20.** As the American Jurisprudence (Second) on Agency, § 194, makes clear, in order to have a

ratification effected by the receipt of benefits, the benefits received by the principal must have been certain, direct and the proximate result of the unauthorized transaction. Then, if the principal, with full knowledge of all material facts, chooses to retain the fruits of his agent's fraud, he is chargeable with his agent's conduct. *Id.* at § 195; *accord People v. Stanin,* 150 Misc.2d 678, 569 N.Y.S.2d 1016, 1018 (S.Ct. Monroe Cty. 1991), *aff'd,* 190 A.D.2d 1093, 594 N.Y.S.2d 1000 (4th Dep't 1993) (When a person acts for another who accepts the benefits of his efforts with knowledge of the material facts surrounding the transaction, the latter must be deemed to have ratified the method employed to achieve those benefits. He may not, even though innocent, receive benefits and at the same time disclaim responsibility for the measures by which they were acquired). As discussed in the text, there is no showing that the $6.7 million was a benefit of the Maxwells' fraud. Further, at the time that the $6.7 million was received, Maxwell Newspapers did not know of the wrongs committed by the Maxwells. These were unearthed subsequent to the bankruptcy, after Kevin had resigned, and at a time when Maxwell Newspapers was not legally free to transfer its property.