### In re MAXWELL NEWSPAPERS, INC., Debtor.

### The OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF MAXWELL NEWSPAPERS, INC., Plaintiff,

v.

### MACMILLAN, INC., Defendant.

**Bankruptcy No. 91 B 15531.
Adv. No. 93–9982A.**

United States Bankruptcy Court,
S.D. New York.

Dec. 14, 1995.

**284**

Paul, Weiss, Rifkind, Wharton & Garrison by Robert D. Drain, Jeffrey D. Saferstein, Jennifer A. Kasmin, New York City, for Maxwell Macmillan Proceeds Liquidating Trust.

Kaye, Scholer, Fierman, Hays & Handler by Herbert S. Edelman, Scott M. Berman, Donna M. Gitter, New York City, for Headington Holdings, Ltd., London and Bishopsgate Group, Ltd. and Robert Maxwell Group, plc.

## OPINION

TINA L. BROZMAN, Bankruptcy Judge.

Some time ago I ruled that Maxwell Newspapers, Inc. ("Maxwell Newspapers"), a chapter 11 debtor, was not liable to Mirror Group Newspapers, plc and certain of its affiliates (collectively, "MGN") for the diversion of MGN's assets to Maxwell Newspapers by their common principals because the diverted assets were promptly transferred to still other entities controlled by the principals without any benefit accruing to Maxwell Newspapers. These transfers in and out of Maxwell Newspapers' account occurred over a particular four-day span. Now, the assignees of the committee of unsecured creditors of Maxwell Newspapers (the "Committee") assert that they are entitled to recover, in the stead of Maxwell Newspapers, other transfers of funds which Maxwell Newspapers made to Macmillan, Inc. ("Macmillan"), also a chapter 11 debtor, because those transfers constituted transfers of Maxwell Newspapers' property without consideration. Like Maxwell Newspapers and MGN, Macmillan was controlled by the late Robert Maxwell ("Maxwell") and his family. Macmillan cries "foul," asserting under a variety of legal theories that symmetry is lacking— Maxwell Newspapers should not be permitted on the one hand to escape liability for transfers made to it by related entities and on the other hand to recover for transfers which it made to yet other related entities. Accordingly Macmillan has asked that I dismiss the adversary complaint and proof of claim filed on behalf of Maxwell Newspapers.[1]

### I.

#### A. *Necessary Background*

The facts regarding the four days of transfers into Maxwell Newspapers are extensively discussed in *Mirror Group Newspapers, plc v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.),* 164 B.R. 858 (Bankr. S.D.N.Y.), *aff'd without decision,* No. 94 Civ. 2711 (S.D.N.Y. June 14, 1994) (the "MGN decision"), familiarity with which is assumed.

---

**1.** The adversary complaint and proof of claim cover the same asserted right to recovery; they have been consolidated for all purposes with the consent of the parties.

The factual development in this decision will therefore be limited to that which is essential to an understanding of the issues.

On March 22, 1993, MGN initiated an adversary proceeding (the "MGN action") against Maxwell Newspapers seeking to recover MGN funds fraudulently transferred to the debtor at the behest of Robert Maxwell and his son Kevin. Either directly or indirectly, Maxwell controlled both MGN and Maxwell Newspapers. MGN asserted that Maxwell's actions had to be imputed to Maxwell Newspapers; Maxwell Newspapers countered that if it had to be encumbered with Maxwell's fraud then so too did MGN, such that MGN was precluded from recovering. Alternatively, Maxwell Newspapers contended that the adverse interest exception to the law of agency applied to prevent liability from attaching for Maxwell's actions. Both sides agreed that whether or not the adverse interest exception could be invoked was critical to resolution of their dispute.

Following a trial on the merits, I determined that the interest of the Maxwells, father and son, both in purchasing and operating the Daily News (the tabloid which Maxwell Newspapers had acquired from the Tribune Company), was to keep the newspaper alive so that Maxwell Newspapers could function as a money-laundering device through which the Maxwells could siphon funds to and from Maxwell-controlled entities in furtherance of their own private agenda. *Id.* at 869. I described what occurred as follows:

> At all times until his death, Robert Maxwell had authority to transfer funds into or out of all Maxwell Newspapers' bank accounts. This enabled him, aided by his son and certain of his London staff, to use the bank accounts over the course of the eight or nine months after he acquired the Daily News to effect transfers of misappropriated funds of various Maxwell-controlled entities, including MGN. This is not to suggest that the misappropriated funds were diverted to Maxwell Newspapers for its use. Rather, *for the most part,* the funds rested with Maxwell Newspapers only long enough for them to be transferred to a variety of other destinations. Between March and November, 1991, some \$238 million was transferred into the Maxwell Newspapers accounts, *most of which* was promptly transferred out. (Emphasis added.)

164 B.R. at 862. Note that I did not state that all funds which had been misappropriated over the course of eight or nine months were promptly transferred out.

To decide whether the fraud which the Maxwells perpetrated against MGN could be imputed to Maxwell Newspapers, I looked to whether it was committed on behalf of or against Maxwell Newspapers and concluded that it was of the latter variety, with Maxwell Newspapers a victim much the same as MGN. *Id.* at 869. In order to reach that determination, I had to resolve whether the "fruit of the fraud" exception to the adverse interest exception applied to the otherwise pertinent black letter law that an agent's acts are imputed to his principal. This in turn depended on whether the Maxwells were acting adversely to Maxwell Newspapers' interest and, even if they were, whether Maxwell Newspapers nonetheless ratified the conduct by accepting the fruits of their fraud, that is, by retaining any benefits conferred by the fraud. *Id.* at 866–67. I held that Maxwell Newspapers derived no benefit from the four days of transfers of MGN's funds into and out of Maxwell Newspapers' account and that from the outset the Maxwells' motivation was to further their own interests, rather than those of Maxwell Newspapers, a conclusion bolstered by their conduct during the four days in question.

B. *Maxwell Newspapers' Claims Against Macmillan*

Macmillan's chapter 11 petition was filed on November 10, 1993, just about two years after Maxwell Newspapers'. Pursuant to its plan of reorganization, Macmillan assigned those liabilities which were not otherwise satisfied under the plan, including the debt here asserted, to the Maxwell Macmillan Proceeds Liquidating Trust (the "Macmillan Trust").

Alleging sums due from Macmillan, Maxwell Newspapers through its Committee filed a proof of claim as well as an adversary

proceeding against Macmillan (the "Macmillan action"). Both the proof of claim and the complaint allege that Macmillan is indebted to Maxwell Newspapers in the amount of $6,500,000, subsequently reduced to $850,-000 [2]. The Committee obtained the right to pursue recovery from Macmillan pursuant to so-ordered stipulations dated April 8 and November 29, 1993. Thereafter, as a result of negotiations between Maxwell Newspapers, the Committee, and certain creditors, the Committee assigned the Macmillan action to Headington Holdings, Ltd., London and Bishopsgate Group, Ltd., and Robert Maxwell Group, plc (collectively, the "claimants") [3] in exchange for the withdrawal of their proofs of claim aggregating some $93 million. The effectiveness of the stipulation was conditioned on Maxwell Newspapers' success in the MGN action. Had MGN prevailed in that case, the stipulation would not have become effective and the parties would have been returned to the status quo, with the claimants retaining their $93 million claims against Maxwell Newspapers and Maxwell Newspapers its claims against Macmillan. This settlement was incorporated into the plan of reorganization through a court-approved modification at the time that that plan was confirmed.

The Committee's complaint, filed before judgment was rendered in the MGN action, alleges that on April 19, August 2, and October 1, 1991, Robert Maxwell caused Maxwell Newspapers to transfer a total of $6.5 million to Macmillan bank accounts. Admitting at paragraphs 3 and 4 that Maxwell Newspapers believes that the transfers were "conduit" transactions of property belonging to others, the Committee nonetheless reserves the estate's rights by pleading that in the event the court were to decide that the funds did belong to Maxwell Newspapers then Maxwell Newspapers would be entitled to "recover such funds transferred from [its] accounts to Macmillan...." The legal theories upon which recovery is predicated are fraudulent transfers pursuant to sections 544, 548, and 550 of the Bankruptcy Code and sections 273 and 274 of the New York Debtor & Creditor Law as well as common law conversion.

### C. The Motion to Dismiss

Relying on paragraphs 3 and 4 of the complaint, which admit that the transfers were not of the debtor's property, a necessary prerequisite to the maintenance of an avoidance action and a claim of conversion, the Macmillan Trust now moves pursuant to Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure (made applicable to this adversary proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure) to dismiss the complaint. The Macmillan Trust contends that the claimants lack standing to pursue the claims which they have asserted and are estopped both collaterally and judicially from arguing that the conduit funds belonged to the debtor. Disagreeing with the standing argument mounted under rules 12(b)(1) and 12(b)(6), the claimants respond that they are entitled both to maintain their action and to plead in the alternative. Further, they urge that they should now be allowed to argue an "account stated" legal theory, rather than the conditional one expressed so clearly in their complaint.

### II.

### A. Standing

■ The Macmillan Trust argues that the claimants lack standing to bring the avoidance claims (numbered one through nine) because such claims cannot be assigned at all, but, in any event, certainly not for the benefit of individual creditors rather than the estate. As a fallback the Trust urges that if a single creditor can be granted authority to pursue an avoidance claim for its own benefit, it cannot be given that authority where consideration is lacking, as is said to be the case here. None of the arguments has merit.

The contention that creditors lack standing to bring avoidance actions is overstated. Whereas the Bankruptcy Code contains no explicit authority for creditors to initiate adversary proceedings, it is well recognized in

---

2. The reduction comes about by netting the amounts which one estate owes the other.

3. These entities too were part of the Maxwell family of companies.

chapter 11 cases that under limited circumstances avoidance powers may be assigned to someone other than the debtor or the trustee. *See, e.g., Churchfield Management & Inv. Corp.*, 122 B.R. 76, 81 (Bankr.N.D.Ill. 1990); *Kroh Bros. Dev. Co. v. United Missouri Bank (In re Kroh Bros. Dev. Co.)*, 100 B.R. 487, 494–98 (Bankr.W.D.Mo.), *appeal denied*, 101 B.R. 1000 (W.D.Mo.1989). "Congress has not precluded the bankruptcy court from granting standing to a creditor if such standing furthers Congress's purpose in creating the avoidance actions found in 11 U.S.C. §§ 547 and 548 in the context of a Chapter 11 reorganization." *Canadian Pac. Forest Prods., Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.)*, 66 F.3d 1436 (6th Cir.1995); *cf. also Unsecured Creditor's Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904–05 (2d Cir.1985) (holding that sections 1103(c)(5) and 1109(b) imply a qualified right for a creditors' committee to initiate avoidance suit on behalf of the estate with the approval of the bankruptcy court when the trustee or debtor in possession unjustifiably fails to do so).

Indeed section 1123(b)(3)(B) specifically permits a plan of reorganization to vest an entity which is neither the debtor nor the trustee but is an appointed representative of the estate with the power to retain and enforce a claim belonging to the debtor or to the estate. And an avoidance claim is within the embrace of that statute. *Citicorp Acceptance Co., Inc. v. Robison (In re Sweetwater)*, 884 F.2d 1323 (10th Cir.1989); *Bonwit Teller, Inc. v. Jewelmasters, Inc. (In re Hooker Investments, Inc.)*, 162 B.R. 426, 432 (Bankr. S.D.N.Y.1993). To establish standing pursuant to section 1123(b)(3)(B), the plaintiff who is neither the debtor nor the trustee must establish two elements: "(1) that it has been appointed, and (2) that it is a representative of the estate." *McFarland v. Leyh (In re Texas Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir.1995); *Retail Marketing Co. v. King (In re Mako, Inc.)*, 985 F.2d 1052, 1054 (10th Cir.1993). The appointment requirement is satisfied when the representative has been approved by the bankruptcy court, typically when the court approves a reorganization plan which incorporates the transfer. *See Briggs v. Kent (In re Professional Inv.*

*Properties)*, 955 F.2d 623, 626 (9th Cir.1992); *Texas Gen.*, 52 F.3d at 1335. The second requirement is satisfied when the court determines that the appointed party's responsibilities qualify it as a representative of the estate. *Id.; In re Sweetwater*, 884 F.2d at 1326–27. The primary consideration in determining whether the creditor is a "representative of the estate" is the benefit bestowed upon the estate as a result of the transfer, in particular the benefit to the unsecured creditors. *See Churchfield Management*, 122 B.R. at 82. The Ninth Circuit offers this guide: "If a creditor is pursuing interests common to all creditors or is appointed for the purpose of enforcement of the plan, he may exercise the trustee's avoidance powers." *Professional Inv.*, 955 F.2d at 626. This is not to say that unsecured creditors must benefit from a favorable *result* in the avoidance action; the benefit may come from the transfer of the claim itself through, for example, settlement yielding a benefit to the unsecured creditors. *Id.; Churchfield Management*, 122 B.R. at 82 (noting that benefit to the unsecured creditors has been broadly construed and discussing cases).

Given the incorporation into Maxwell Newspapers' plan of the settlement pursuant to which the avoidance claims were assigned to the claimants, the first part of the test under section 1123(b)(3)(B) has been met. Where the Macmillan Trust says the problem lies is in the second prong of the test, that is, whether the claimants can be said to be the representatives of the estate which, in turn, hinges upon whether there is benefit to the unsecured creditors. If one were to focus solely on the eventual recovery from the action, then the Trust would be correct inasmuch as individual creditors alone will be the recipients of any recovery. That, however, is an unduly narrow view belied by the cases just discussed. Once one looks to the benefits derived by the unsecured creditors from the transfer of the claims any concern that the claimants may not be the representatives of the estate simply vanishes, for the class of unsecured creditors has been shorn of some $93 million in claims. Stated plainly and simply, the claimants are enforcing the terms of the plan, a right with which it vested them.

The cases cited by the Macmillan Trust compel no different result. Two of them are chapter 7 cases to which section 1123 does not apply. One is distinguishable in that it involved a single creditor who without court approval decided to pursue a fraudulent transfer action in the bankruptcy court. *Nebraska State Bank v. Jones,* 846 F.2d 477, 478 (8th Cir.1988). And the last, to the extent relevant, constitutes dictum. *In re Sapolin Paints, Inc.,* 11 B.R. 930, 937 (Bankr.E.D.N.Y.1981)[4].

■ Because I have concluded that the unsecured creditors were benefitted by the stipulation pursuant to which the avoidance claims were transferred, it will come as no surprise that I think little of the argument that the claimants gave no consideration for the transfer of the claims to them. The Trust's argument rests on the contingency in the stipulation, namely, that if the claims of Mirror Group in the MGN action were upheld, the stipulation would be of no force and effect. In that event, the claimants would be left with their $93 million claims and the debtor's estate with its avoidance claims. In the alternative, if the Mirror Group's claims were disallowed, then the claimants would give up their $93 million claims and the estate, in return therefor, would transfer the avoidance claims. But in no event could the claimants both retain their $93 million claims and pursue the avoidable transfers. Thus the consideration is unassailable. As it transpired, because the Mirror Group's claims were disallowed, the debtor was spared the litigation respecting the $93 million claims as well as the litigation regarding the transfers to Macmillan, which, in and of itself, constituted benefit to an estate with sorely limited assets.

The threshold obstacle overcome, we turn to the meat of the motion—whether there is any avoidance claim left to pursue.

### B. *Collateral Estoppel*

■ The Macmillan Trust contends that in the MGN decision I held that the money at issue here was not property of the debtor.

As a result, it says, collateral estoppel is an absolute bar to the maintenance of the avoidance claims. The claimants believe themselves unscathed by the admission in their inherited complaint that the funds are so-called "conduit" funds which never became property of the estate. Further they argue that the Macmillan Trust takes unjustified liberties when it characterizes my MGN decision. I agree.

Collateral estoppel "prevents the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action." *L.J. Hooker Int'l Fla., Inc. v. Gelina (In re Hooker Invs., Inc.),* 131 B.R. 922, 931 (Bankr.S.D.N.Y.1991) (quoting *Balderman v. U.S. Veterans Admin.,* 870 F.2d 57, 62 (2d Cir.1989)). "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation" of that issue. *Remington Rand Corp. v. Amsterdam–Rotterdam Bank, N.V.,* 68 F.3d 1478, 1485 (2d Cir.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994) (quoting *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980))). This rationale also applies to non-parties who "assume control over litigation in which they have a direct financial or proprietary interest." *Id.* at 1485–86 (quoting *Montana v. United States,* 440 U.S. 147, 154, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)). In the MGN action I held that the Maxwells' conduct vis-à-vis MGN should not be imputed to the debtor because the debtor "did not benefit from" the transfers into and out of its account during four days in October 1991. It was unnecessary to determine whether the monies became property of the debtor, even if only for a short period. Whereas I determined that the Maxwells were over the course of some eight or nine months engaged in a fraud, one of whose victims was Maxwell Newspapers, I did not determine whether any portion or the aggregate of the funds which the Maxwells transferred into Maxwell Newspapers' accounts belonged to the debt-

---

**4.** In any event, the cases upon which *Sapolin Paints* is based are cases under the former Bankruptcy Act, which did not contain any provision analogous to section 1123(b)(3)(B), and therefore do not represent good law any longer. *Professional Inv. Properties,* 955 F.2d at 626.

or. What was required and what I decided was that the debtor was not benefited by the transfers during the four days and that it did not ratify the fraud of the Maxwells by accepting any fruits of their actions. Significantly, I did not even find that all monies which the Maxwells diverted from other entities into Maxwell Newspapers were immediately transferred out. The transfers here assailed were made at a different time and, perhaps, under different circumstances. So had I held that the monies diverted from MGN never became property of Maxwell Newspapers, that nonetheless would not have dictated that the transfers which Maxwell Newspapers made at some other time to Macmillan from a source as yet unidentified were also not property of the debtor. For all these reasons, collateral estoppel is no bar.

As to the point that the complaint pleads that the debtor believes that the funds at issue were not its property, this is obviously a question of law for the court to resolve as part and parcel of the claims asserted. In any event, any defect is certainly curable by amendment which I will permit the claimants to make.

## C. *Judicial Estoppel*

■ The other estoppel variant touted by the Macmillan Trust is judicial estoppel. The claimants are said to be judicially estopped from asserting the voidability of the transfers because the claimants' predecessor in interest, Maxwell Newspapers, successfully argued an inconsistent position in the MGN action—that Maxwell Newspapers was a mere conduit. The response is that in the MGN decision Maxwell Newspapers argued that the funds at issue did not belong to the debtor because they were fraudulently obtained by the debtor through conduct of the Maxwells whereas here the funds, which of course are different funds, were not fraudulently obtained. Therefore, the claimants conclude, their argument is not inconsistent with their predecessor's. Further they argue, as I discussed in the immediately preceding section, that I did not adopt the supposedly inconsistent position that the monies transferred into and out of Maxwell Newspa-

pers' account were never property of the debtor.

■ Judicial estoppel prevents a party who benefits from the assertion of a certain position from subsequently adopting a contrary one. *Young v. Department of Justice,* 882 F.2d 633, 639 (2d Cir.1989). "It is supposed to protect judicial integrity by preventing litigants from playing 'fast and loose' with courts, thereby avoiding unfair results and 'unseemliness.'" *Id.* Simply because a party's interests have changed in subsequent litigation, he or she may not assume a contrary position from the successful position espoused in the first litigation. *See Davis v. Wakelee,* 156 U.S. 680, 689, 15 S.Ct. 555, 558, 39 L.Ed. 578 (1895). "The offense is not taking inconsistent positions so much as it is winning twice, on the basis of incompatible" factual assertions. *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.,* 840 F.Supp. 211, 219 (E.D.N.Y.1994) (citing *Eagle Found., Inc. v. Dole,* 813 F.2d 798, 810 (7th Cir.1987)). Both parties cite *Bates v. Long Island Railroad Co.,* 997 F.2d 1028 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993) as setting forth the appropriate standard for invocation of judicial estoppel: "First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner." *Id.* at 1038.

■ Here, the debtor never argued that all funds which were received by Maxwell Newspapers from other Maxwell-owned entities were "mere conduit" funds which did not become its property. Throughout the litigation, the debtor urged that I should look only at the four days of transfers in question; it was MGN which asserted that I had to examine the whole course of conduct of the Maxwells. I never decided whether the "mere conduit" theory borrowed from the law of avoidable transfers had any applicability because I decided the dispute based on the principles of agency; I determined that transfers made over a four-day period were not the legal responsibility of the debtor. Although I did look at the course of the Maxwells' activities relative to Maxwell

290

Newspapers in order to determine whether the debtor was a beneficiary or a victim of their fraud, I did not find that every dollar transferred into Maxwell Newspapers while it was controlled by the Maxwells was transferred fraudulently. So while I adopted Maxwell Newspapers' argument in some manner with respect to a particular set of transfers, Maxwell Newspapers did not argue and I did not rule that all transfers made by Maxwell Newspapers fit the same mold. It may well be that Maxwell Newspapers ultimately should not be permitted on the one hand to escape liability for transfers which it made of funds diverted from other entities and on the other hand to recover for itself funds which it transferred to other entities if the factual scenarios are similar. Nevertheless, this is a motion to dismiss and in evaluating such a motion "the court's task is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *McCoy v. Goldberg*, 883 F.Supp. 927, 932 (S.D.N.Y.1995). The claimants rightfully point out that they are entitled to argue in the alternative and that the federal courts apply liberal standards in determining the legal sufficiency of pleadings. In any event, on a motion to dismiss, I must not only accept all factual allegations as true but I must draw all reasonable inferences in the plaintiff's favor as well. *Id.* Because I cannot conclude at this time that the circumstances surrounding the transfers of MGN's monies are the same ones surrounding the transfers to Macmillan, I cannot impose judicial estoppel as a bar.

Accordingly, the motion to dismiss is denied. SETTLE ORDER consistent with this decision.