**In re ALLEGIANCE TELECOM, INC., et al., Debtors.**

**No. 03–13057(RDD).**

United States Bankruptcy Court, S.D. New York.

Dec. 8, 2006.

Brown Rudnick Berlack Israels LLP, by Martin S. Siegel and Emilio A. Galvan, for XO Communications, Inc.

Akin Gump Strauss Hauer & Feld LLP, by Abid Qureshi and Vincenzo DeLeo, for the Allegiance Telecom Liquidating Trust.

*CORRECTED MEMORANDUM OF DECISION ON XO'S MOTION FOR PAYMENT OF ADMINISTRATIVE EXPENSES OR XO'S CLAIMED CASH AND RELATED DISPUTES PERTAINING TO ASSET PURCHASE AGREEMENT*

ROBERT D. DRAIN, Bankruptcy Judge.

Allegiance Telecom, Inc. ("Allegiance") and certain direct and indirect subsidiaries primarily operated a facilities-based national local exchange telecommunications business. They commenced chapter 11 cases in this Court on May 14, 2003, and in November and December of 2003 negotiated with third parties for the sale of substantially all of their business as a going concern. After an auction (the "Auction") that started on February 12, 2004 and continued into the morning of the next day,[1] Allegiance announced that XO Communications, Inc. ("XO"), itself a former chapter 11 debtor and, after its emergence from bankruptcy, under the ultimate control of Mr. Carl Icahn, was the winning bidder.

XO's bid was the highest and best at the Auction for two reasons: first, XO offered the highest price, a combination of approximately $311.2 million in cash and 45,380,000 shares of XO common stock; second, notwithstanding that as a regulatory matter XO could not acquire the business until receipt of certain FCC and state PUC

---

1. 5/2 Trial Tr. 32.

approvals, which might take months,[2] XO agreed that, after the occurrence of other relatively easily satisfied conditions, (a) XO would deliver the purchase price into escrow, (b) XO would start to manage the business under an Operating Agreement[3] with Allegiance, and, most importantly, (c) XO's obligation to close the sale would become unconditional. See XO's Auction Bid Proposal ¶ 8 (Trial Ex. 1). The other bidder, Qwest Communications, Inc. ("Qwest") was not prepared to fully adopt this two-step approach (referred to as the "soft/hard closing" or "Early ·Funding Date" concept), which materially improved XO's bid by significantly reducing Allegiance's closing risk.[4] XO agreed to the concept not only because it enhanced its bid over Qwest's, but also because of XO's strong desire to integrate its business with Allegiance's as soon as possible to obtain what XO believed to be $100 million to $200 million of synergies.[5]

After the Auction, XO and Allegiance negotiated and executed an Asset Purchase Agreement, dated February 18, 2004 (the "APA"),[6] under which Allegiance and an affiliate, Allegiance Telecom Company Worldwide ("ATCW"; with Allegiance, the "Sellers"), agreed to sell substantially all of their assets and the stock of the reorganized direct and indirect subsidiaries of ATCW to XO. On February 19, 2004 the Court approved the Sellers' entry into the APA.

On June 10, 2004, Allegiance obtained confirmation of its Third Amended Joint Plan of Reorganization (the "Plan"), which went effective on June 23, 2004. The Plan provided for the creation of the Allegiance Telecom Liquidating Trust (the "ATLT") and the transfer to the ATLT of various remaining assets of the Allegiance debtors, including the "Excluded Assets" as defined in section 2.2 of APA (that is, the Sellers' assets that XO did not buy). See Plan §§ 5.3(b), 1. 18, 1.64.

The two-step, soft/hard closing approach has led to the primary dispute before the Court. XO and the ATLT disagree about whether XO is entitled, as XO contends, to keep the proceeds of the Sellers' pre-soft closing accounts receivable that were paid between the soft closing, or Early Funding Date, and the hard, or final Closing Date, or whether, as the ATLT contends, this cash was not intended to be transferred to XO. The parties agree that between $40 million and $41 million was paid on these accounts receivable before the Closing Date.

Although the parties have primarily focused on this issue, they also have aired other disputes, pertaining to (a) the amount XO was required to reimburse Allegiance for expenses of the business paid by Allegiance during the period between the Early Funding Date and the Closing Date, (b) the calculation of a working capital adjustment to the purchase price under the APA, (c) the amount of the agreed adjustment, or "true-up" under a prior settlement between the parties relating to a different set of issues under the APA, (d) whether XO purchased certain other as-

---

**2.** 5/2 Trial Tr. 38–39.

**3.** Trial Ex. 7.

**4.** 5/2 Trial Tr. 38–40, 154–155; 5/5 Trial Tr. 209.

**5.** 5/2 Trial Tr. 38, 98, 102, 106, 179; 5/3 Trial Tr. 127; 5/5 Trial Tr. 192–193; 3/3 Icahn Dep. Tr. 29.

**6.** Trial Ex. 3. They based this agreement on the form of agreement previously entered into between Allegiance and the stalking horse bidder, Qwest (Trial Ex. 2), modified to reflect the changes resulting from the Auction. 5/2 Trial Tr. 189, 191–192.

sets under the APA, and (e) whether certain liabilities should, under the transaction documents, be assumed by XO or, instead, should have been paid by the Sellers. The parties have acknowledged that some of these disputes, which have delayed full performance of the APA, are not disputes on the merits but were raised in an attempt to preserve setoff claims, in turn primarily dependent upon the outcome of the main issue between them, and that certain others are not yet ripe for determination. As discussed below, moreover, the APA contains an alternative dispute resolution ("ADR") procedure for the two most significant of these additional controversies, although not for the primary issue, discussed above.

This memorandum of decision first provides the Court's rationale for concluding that the ATLT's position on the main issue, XO's claim to the benefits of the pre-Closing Date proceeds of pre-Early Funding Date accounts receivable, is correct, and addresses the remaining issues, to the extent they are ripe, only insofar as they should not be left to the binding ADR procedures contained in the APA.

*Discussion*

■ A. *Jurisdiction.* The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(b), notwithstanding the Plan's consummation. Both the order approving Allegiance's entry into the APA and the order confirming the Plan [7] reserved the Court's jurisdiction to decide the disputes addressed herein, and the disputes involve the interpretation and implementation of the APA and the Plan and directly affect distributions to creditors. *See Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.),* 304 F.3d 223,

229–30 (2d Cir.2002); *Penthouse Media Group v. Guccione (In re Gen. Media, Inc.),* 335 B.R. 66, 73–74 (Bankr.S.D.N.Y. 2005). The exception, as discussed below, is the Court's lack of power to decide the parties' disputes, even though this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O), to the extent that they are subject to mandatory ADR that will not necessarily jeopardize or inherently conflict with the objectives or provisions of the Bankruptcy Code. *MBNA Am. Bank, N.A. v. Hill (In re Hill),* 436 F.3d 104, 108, 111 (2d Cir.2006).

■ B. *Contract Interpretation.* "Under New York law,[8] a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir.1992). "Under New York law, ... if a contract is unambiguous on its face, its proper construction is a question of law." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990). A court should not look beyond the confines of the contract to extrinsic evidence if its relevant provisions are plain and unambiguous. *W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990); *Nicholas Laboratories, Ltd. v. Almay, Inc.,* 900 F.2d 19, 21 (2d Cir.1990). "When parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.,* 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004).

---

7. Trial Exs. 102 and 131, respectively.

8. In light of the relevant agreements' choice of law provisions, the parties do not dispute that New York law applies. See APA § 9.5;

Operating Agreement § 7.7. *Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 146 n. 3 (2d Cir.2002).

■ This is particularly appropriate if the contract "was negotiated between sophisticated, counseled business people negotiating at arm's length." *Id.* In such circumstances, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Id.* (internal quotations and citations omitted). *See also W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639; *Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 658 N.E.2d 715 (1995).

■ Giving the terms of a contract their plain meaning, a court should find contractual provisions ambiguous only if they are reasonably susceptible to more than one interpretation by reference to the contract alone. *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 139 (2d Cir. 2000); *Burger King Corp. v. Horn & Hardart Co.,* 893 F.2d 525, 527 (2d Cir.1990). "Contract language is unambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Metropolitan Life Ins. v. RJR Nabisco,* 906 F.2d at 889 (internal quotations and citation omitted). "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Id. See also Lee v. BSB Greenwich Mortg. L.P.,* 267 F.3d 172, 179 (2d Cir.2001) ("any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms").

■ 1. *The APA.* In light of the foregoing principles it is clear that the parties did not provide in the APA for XO's purchase of the proceeds of the Sellers' presoft closing date accounts receivable that were paid between the soft closing (referred to in the APA as the Early Funding Date [9]) and the hard closing (referred to in the APA as the Closing Date [10]). Under section 2.2(a) of the APA, the parties agreed that "all cash and cash equivalents . . . existing *as of the Closing Date* constitute Excluded Assets" (emphasis added); that is, under the APA XO did not purchase the Sellers' cash and cash equivalents, including the proceeds of accounts receivable, existing on the Closing Date. Nor did XO purchase the underlying accounts receivable until the Closing Date. See APA § 2.1(g), which provides that only "at the *Closing,* Sellers shall sell . . . to [XO] . . . [a]ccounts, notes and other receivables of Sellers. . . ." (Emphasis added.)

XO points to only one provision of the APA, section 3.1(d), to support its contention that the date of the transfer of the Sellers' accounts receivable was not the Closing Date but, rather, the Early Funding Date, and that any cash collected on the pre-Early Funding Date accounts receivable, even if paid before the Closing Date was sold to XO. The plain language of section 3.1(d) does not support XO's argument, however. It provides merely that upon satisfaction of the conditions that trigger the Early Funding Date, XO shall pay the purchase price into escrow, the parties shall execute the Operating Agreement, XO shall start to manage the Sellers' business, and "the risk of loss shall

9. See APA § 3.1(d) for definition of "Early Funding Date."

10. See APA § 3.1(a) for definitions of "Closing" and "Closing Date."

transfer to [XO], and [XO's] obligations to close the transactions contemplated hereby shall become unconditional and irrevocable." APA § 3.1(d).

XO contends that it would never have taken on the unconditional risk of *loss* on the soft closing, or Early Funding Date, under section 3.1(d) of the APA if it did not also receive at that time all of the *benefits* of the Sellers' business, including the existing accounts receivable and their proceeds. XO bolsters this position by arguing that it would have been contrary to the parties' interests to have provided for the adjustment of the purchase price based on *working capital as of* the Early Funding Date,[11] rather than as of the Closing Date, unless XO was supposed to receive all proceeds of the Early Funding Date accounts receivable, whether collected before or after the Closing Date.

The trouble with XO's position, however, is that this is not what sections 2.1(g), 2.2(a) or 3.1(d) of the APA say. Those provisions do not state that XO shall receive the *benefits* of the pre-Early Funding Date accounts receivable proceeds collected before the Closing Date; to the contrary, as noted above, sections 2.2(a) and 2.1(g) state that such cash is an Excluded Asset and that the Sellers' accounts receivable are not transferred until the Closing Date. While XO's argument in favor of parallelism (that it should not have the post-Early Funding Date risk of loss unless it also has the benefit of all post-Early Funding Date cash) might have been a

good point to have made during the negotiation of the APA, it is not the only possible outcome, as shown, first and foremost, by the APA's plain language.

One cannot conclude, moreover, that the absence of the phrase "and the benefits of the Sellers' business" from section 3.1(d) was absurd or a scrivener's error. For example, a quite conceivable quid pro quo for XO's assuming the risk of loss on the Early Funding Date would simply be the simultaneous grant to XO of the right to manage Allegiance's business and integrate it with XO's,[12] something upon which XO placed a very high value.[13]

Another reasonable quid pro quo for XO's Early Funding Date obligations would be XO's receipt of the benefits of the accounts receivable that were created after XO began to manage the business, but not the pre-Closing Date proceeds of accounts receivable that arose before XO had the right to manage the business. This view receives support from APA §§ 2.3(a)-(b) and (f), in which XO assumed various liabilities relating to the ownership of the Acquired Assets, in each case only "to the extent that the event or state of facts giving rise to such Liability occurs after the Early Funding Date," and APA §§ 2.4(c)-(d), (f) and (i)-(j), in which the Sellers retained responsibility for various liabilities "to the extent that the event or state of facts giving rise to such Liability occurs prior to the Early Funding Date," even if the liability came due after the

---

11. See APA § 3.4, which provides for a Working Capital Purchase Price Adjustment tied to the Early Funding Date and does not contain a true-up mechanism to reflect changes in working capital between the Early Funding Date and the Closing Date.

12. See Operating Agreement § 5.1(c), which provides, "The parties mutually expect and agree that [XO] will immediately take all actions reasonably required to optimize the net-

works and business operations of Sellers, and to realize all reasonably achievable network and operational savings and efficiencies ... so long as such actions maintain a level of service quality substantially consistent with the level of service quality provided by Sellers prior to the Early Closing Date."

13. 5/2 Trial Tr., 98, 102, 106, 179; 5/3 Trial Tr. 127.

Early Funding Date. That is, the parties did recognize the Early Funding Date as a dividing line in time, but, contrary to XO's position, attributed to the Sellers the benefits and burdens of assets and liabilities accrued before such date even if they were paid or came due, as the case may be, after such date.

Similarly, the parties could have rationally chosen the Early Funding Date for purposes of calculating the Working Capital Adjustment because after that date the operation of the business and, therefore, not only control of the Sellers' books and records but also the ability to integrate the business with XO's business, was slated to pass to XO.[14]

Consequently, the APA must be read as written. *See Vermont Teddy Bear,* 1 N.Y.3d at 476, 775 N.Y.S.2d 765, 807 N.E.2d 876 ("the logic of this proposition [that a term is clearly contrary to a party's financial interest] does not justify judicial

insertion of a contract term"); *Wallace v. 600 Partners Co.,* 86 N.Y.2d at 547–48, 634 N.Y.S.2d 669, 658 N.E.2d 715. *See also Rowe v. Great Atl. & Pac. Tea Co.,* 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827, 385 N.E.2d 566 (1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something the parties have neglected to specifically include.... [S]uch lack of foresight does not create rights or obligations."); *Seifert, Hirshorn & Packman, Inc. v. Ins. Co. of North America,* 36 A.D.2d 506, 321 N.Y.S.2d 815, 817 (1st Dep't.1971) ("If the parties to a contract adopt a provision which contravenes no principle of public policy and is not ambiguous, the courts have no right to relieve one of them from disadvantageous terms by a process of interpretation."); *Ackman v. Toren, Inc.,* 6 A.D.2d 427, 179 N.Y.S.2d 128, 129–30 (1st Dep't.1958), *aff'd* 6 N.Y.2d 720, 185 N.Y.S.2d 808, 158 N.E.2d 503 (1959).[15]

---

**14.** XO's witness also acknowledged that keying the APA's working capital purchase price adjustment off of the Early Funding Date provided assurance that Allegiance would have sufficient cash on hand to pay in full its senior secured lenders, who otherwise would have opposed the transaction. 5/2 Trial Tr. 37, 39–40, 184.

**15.** The parties' proffered parol evidence highlights the wisdom of enforcing contractual plain meaning to safeguard commercial transactions against, among other things, the infirmities of memory and self-serving testimony. *W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d at 162, 565 N.Y.S.2d 440, 566 N.E.2d 639. The participants in the Auction, particularly XO's principals, had very little, if any, involvement in preparing or even reviewing the APA before its execution. 5/5 Trial Tr. 188. XO's principals' testimony on what they believed to be "the deal" as it concerned the pre-hard closing date proceeds of pre-soft closing date accounts receivable did not correspond with the testimony of Allegiance's lead negotiator, Mark Tresnowski. *Compare* 5/2 Trial Tr. 81 and 5/3 Trial Tr. 82 and 5/5 Trial Tr. 200–203, 211–212, 225–227. Moreover, none of the

principals on either side of the transaction appear to have discussed the specific allocation of pre-soft closing accounts receivable proceeds with their opposite numbers, very clearly suggesting that whatever "deal" the parties thought may have been implicit in XO's bid never became explicit except in the plain language of the final contracts. (XO also relies on the transcript of the Auction in which Allegiance's investment banker gave XO only a $5 million credit for the Early Funding Date concept. Auction Tr. 31. However, the Auction transcript reflects no discussion of the primary issue before the Court, and, in any event, a valuation by the investment banker who conducted the Auction should not outweigh the plain language of the parties' agreements. The investment banker repeatedly testified that the Auction did not get down to the level of detail of whether XO would have the benefit of the accounts receivable proceeds now at issue. 5/2 Trial Tr. 160–161, 162–163, 167. Nor did either of XO's witnesses recall the amount of the Auction credit, suggesting its, at best, tangential relevance. Finally, the investment banker's focus was simply to get the highest price from two competing parties who were

Adherence to the plain language of sections 2.1(g), 2.2(a) and 3.1(d) of the APA, and the refusal to modify it to correct what might have been XO's bad bargain or unilateral mistake is particularly appropriate given the parties' general commercial sophistication and, specifically, their experience in the sale of businesses and, even more specifically, their experience in the sale of businesses out of bankruptcy.[16] *See Vermont Teddy Bear,* 1 N.Y.3d at 475, 775 N.Y.S.2d 765, 807 N.E.2d 876; *W.W.W. Assoc., Inc. v. Giancontieri,* 77 N.Y.2d at 163, 565 N.Y.S.2d 440, 566 N.E.2d 639. The soft/hard closing mechanism was the primary structural change in the transaction from Qwest's stalking horse template. If these parties really intended something different from the plain language of the APA pertaining to that aspect of the transaction, it can be assumed that they would have written it.

2. *The Auction term sheet and the Sale Order.* In light of the APA's plain meaning, XO's additional reliance on its Auction term sheet and the February 20, 2004 order approving Allegiance's entry into the APA (the "Sale Order") also is unavailing.

Unlike the APA (and also, as noted below, unlike the Operating Agreement), XO's Auction term sheet states, "Cash generated *or used* by the Acquired Assets after the Change of Management Control Date shall be for the account of XO."[17] (Emphasis added.) However, the parties

agreed that the relevant Transaction Documents would not include this term sheet,[18] and that the APA and the other Transaction Documents "supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties."[19] The final versions of the parties' agreements, therefore—the APA and the other Transaction Documents—not the Auction term sheet, govern.

XO also relies on the Sale Order, which, unlike the APA, refers to XO's right to certain *benefits* as well as XO's assumption of liabilities after the Early Funding Date:

The Early Funding Process, including, without limitation, *Buyer's* (a) right to manage the Acquired Assets pursuant to the Operating Agreement in connection therewith and in accordance with the Purchase Agreement, subject to the supervision of the Debtors, (b) assumption of all liabilities *relating to the* Acquired Assets incurred from and after the Early Funding Date and (c) *exclusive right to receive and retain all benefits from the Acquired Assets and businesses relating thereto from and after the Early Funding Date,* is hereby approved and authorized pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

Sale Order ¶ 10 (emphasis added). It should be noted, first, however, that this provision of the Sale Order is not an

submitting differently structured bids, which may have led him to undervalue the Early Funding Date concept.)

**16.** Mr. Icahn and his associates are among the world's most knowledgeable investors in and acquirers of financially distressed businesses, *as reflected by, among other things,* their prior acquisition of XO. Moreover, XO had very experienced and capable professional advisors. Allegiance also had very experienced and capable professional advisors, and

Mr. Tresnowski was not only an experienced businessman but also, before joining Allegiance, a partner in a major law firm with a specialty in mergers and acquisitions.

**17.** Trial Ex. 1 ¶ 8(h).

**18.** APA § 1.1.

**19.** *Id.* § 9.6.

agreement between the parties, but, rather, a Court authorization; it does not, as XO suggests, supersede or supplement the APA. Moreover, the foregoing paragraph of the Sale Order tracks the APA in its use of the term "Acquired Assets," which term, as discussed above, excludes the cash at issue; thus, although the Sale Order confirms that XO shall have the benefits of the Acquired Assets from and after the Early Funding Date, it does not turn the cash at issue into an Acquired Asset.[20] See also Plan §§ 5.3(b), 1.18 and 1. 64, which provide that on the Plan's Initial Effective Date the ATLT, not XO, shall receive, among other things, all other assets of the Estates that are not the Acquired Assets, including the Excluded Assets as defined in the APA. Finally, the provision of the Sale Order quoted above, like the APA, refers to XO assuming only those Seller liabilities "incurred from and after the Early Funding Date;" that is, liabilities coming due after the Early Funding Date would not be XO's responsibility if they arose or accrued before the Early Funding Date. It is reasonable, therefore, and certainly consistent with the paragraph's reference to the Acquired Assets, to read the Sale Order as confirming XO's receipt only of reciprocal benefits accruing after the Early Funding Date.

**3. *The Operating Agreement.*** That is not the end of the story, however. Indeed, XO chiefly relies on another Transaction Document—the Operating Agreement [21]—to establish its claim to the proceeds of pre-soft closing date accounts receivable that were paid before the hard closing date. Under section 6.2(b) of the APA, the parties agreed to

> enter into an Operating Agreement ... effective as of the Early Funding Date. Pursuant to and as set forth in the Operating Agreement, [XO] shall agree to provide management and related services to Sellers, on behalf of Sellers and subject to the ultimate direction of Sellers and consistent with all applicable law and regulation.

The Operating Agreement effectuates the foregoing APA provision. Under it, XO agreed to assume management of the "Early Funding Date Assets" (the Acquired Assets prior to such assets becoming the Acquired Assets, *id.* §§ 1.1 and 6.1) and the "Non–Transferred Assets" (those assets whose transfer required federal or state regulatory approval or other third party consents, *id.* § 1.1; APA § 2.5, which might occur after the Closing Date). Operating Agreement § 2.1(a).[22]

In addition to providing such services, XO agreed under the Operating Agree-

---

**20.** Nor is that cash "the businesses" of the Sellers, as referred to in paragraph 10(c) of the Sale Order. Cash is not a "business".

**21.** Trial Ex. 7. The Operating Agreement was dated as of April 13, 2004, but its form was agreed to before execution of the APA, to which it was attached as an exhibit.

**22.** Section 1.1 of the Operating Agreement states that " '*Early Funding Date Assets*' means the Acquired Assets which would not be considered 'Non–Transferred Assets' as of the Early Funding Date under Section 2.5 of the [APA]." Section 6.1 of the Operating Agreement provides that "upon the Closing Date and the transfer of the Early Funding Date Assets to [XO], the Early Funding Date Assets shall be considered Acquired Assets under the Asset Purchase Agreement and shall no longer be subject to this Agreement, ... and upon the receipt from time to time of all necessary consents or approvals from any State PUC applicable to the Non–Transferred Assets, and the transfer of the Non–Transferred Assets relating to such State PUC Consent by the Sellers to [XO] pursuant to Section 2.5 of the Asset Purchase Agreement, such Non–Transferred Assets shall be considered Acquired Assets under the Asset Purchase Agreement and shall no longer be subject to this Agreement."

ment "to pay during the [Operating Agreement's] Term such newly accruing actual costs and expenses of the ongoing operations of the [Sellers'] Business. [XO] shall either pay the same directly, or reimburse Sellers for (within fifteen (15) days of receipt of an invoice therefor), all such costs and expenses." *Id.* § 2.1(b).

The parties provided for XO to be compensated for its management services on a cost-plus basis:

> As consideration for [XO] providing Sellers the management services described herein, Sellers agree to pay to [XO] a monthly fee (*"Management Fee"*) equal to the sum of (x) [XO's] costs incurred in providing the management services as to those Early Funding Date Assets and Non–Transferred Assets that have not yet become Acquired Assets as described in Section 6.1 [23] (including, without limitation, [XO's] out-of-pocket expenses and any of Sellers' costs that are reimbursed by [XO] pursuant to Section 2.1(b) above) (*"Manager's Aggregate Monthly Expenses"*) plus (y) 30% of Manager's Aggregate Monthly Expenses.

*Id.* § 4.1.

However, section 4.1 of the Operating Agreement then restricts the source of payment for XO's compensation:

> [XO] shall be paid solely out of the revenue generated by the Early Funding Date Assets and the Non–Transferred Assets for such month (the *"Monthly Fee Receipts"*), collectible by [XO] solely from cash receipts related to the Early Funding Date Assets and the Non–Transferred Assets.

To make the point even more clearly, section 4.1 continues,

In any month during the Term in which the Monthly Fee Receipts are not equal to or in excess of the Management Fee, Sellers will not have any obligation to pay [XO] any additional amount to reimburse [XO] for any costs or losses associated with the Early Funding Date Assets or the Non–Transferred Assets in excess of such receipts (*"Payment Shortfall"*), provided that to the extent Monthly Fee Receipts in any month exceed the Management Fee otherwise due to [XO] hereunder (*"Excess Payments"*), such Excess Payments shall, first, be applied to reduce Payment Shortfalls in prior months, if any, and second, any residual Excess Payment amounts shall be held in escrow to be applied to Payment Shortfalls in future months, if any.

As it happened, Manager's Aggregate Monthly Expenses exceeded the Monthly Fee Receipts throughout the term of the Operating Agreement (and, therefore, there would be no Excess Payments) *if* one assumes, as does the ATLT, that Monthly Fee Receipts do not include the proceeds of pre-Early Funding Date accounts receivable paid before the Closing Date. On the other hand, if, as XO contends, the Monthly Fee Receipts include such cash, XO is owed a Management Fee payable from $100 million of cash receipts as opposed to approximately $60 million, an amount that exceeds XO's obligation to pay "newly accruing actual costs and expenses of the [Sellers'] Business" under section 2.1(b) of the Operating Agreement.

It is clear that by basing XO's fee, in part, on the terms "Early Funding Date Assets" and "Non–Transferred Assets" the parties, in some measure, overrode in section 4.1 of the Operating Agreement the

---

23. See *supra* n. 22, for the applicable language of section 6.1 of the Operating Agreement.

APA's requirement that XO not receive cash under the transaction until the Closing Date and, specifically, under APA §§ 2.2(a) and 2.1(g), that XO would not receive pre-Closing Date cash proceeds of accounts receivable. That is because, as noted above, section 1.1 of the Operating Agreement essentially provides that the "Early Funding Date Assets" are the Acquired Assets *prior* to the Closing Date with the exception of the "Non–Transferred Assets" (which may become Acquired Assets, after the Closing Date, when necessary regulatory approvals or third party consents are received). Having made this distinction from the APA, the parties could have provided in section 4.1 of the Operating Agreement that XO's Management Fee be paid from, among other sources, the pre-Closing Date cash proceeds of *any* pre-Closing Date accounts receivable, regardless whether such accounts receivable were created before or after the Early Funding Date.

The parties did not do this, however. Instead, they provided that "[XO] shall be paid solely out of the *revenue generated* by the Early Funding Date Assets and the Non–Transferred Assets for such month." Operating Agreement § 4.1 (emphasis added). This is a different concept than agreeing that XO shall be paid out of the proceeds of all Early Funding Date Assets, including accounts receivable proceeds, because accounts receivable do not "generate revenue" when the account obligors pay their debts. Instead, accounts receivable are generated and revenue recognized when the underlying debt arose. Thus, before the start of the Operating Agreement's term, the Sellers had already generated the pre-Early Funding Date accounts receivable, assets that would not, later, for a second time, "generate revenue," but, rather, would only be realized in the form of the proceeds actually paid by account obligors. The parties, therefore,

excluded the proceeds of the pre-Early Funding Date accounts receivable from the Monthly Fee Receipts from which the Management Fee was to be paid.

The next clause of section 4.1 of the Operating Agreement corroborates this conclusion. It provides that XO shall be paid out of such Monthly Fee Receipts "collectible by [XO] *solely from cash receipts* related to the Early Funding Date Assets and Non–Transferred Assets" (emphasis added). This additional limitation on the source of funding for XO's Management Fee would be superfluous if the definition of "Monthly Cash Receipts," discussed above, already included, as XO contends, the cash proceeds, or receipts, of the pre-Early Funding Date accounts receivable. The non-redundant, integrated and, therefore, proper interpretation of these two clauses in section 4.1 is, instead, that XO's Management Fee is payable (a) only from revenue generated, or accruing, i.e. from accounts receivable created after, the Early Funding Date, but (b) only to the extent of actual cash receipts from such accounts receivable. *See Scholastic, Inc. v. Harris,* 259 F.3d 73, 83 (2d Cir. 2001) (contracts should be construed in light of "the entire integrated agreement to safeguard against adopting an interpretation that would render any individual provision superfluous") (internal quotation omitted); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 599, 217 N.Y.S.2d 1, 176 N.E.2d 37 (1961).

Additional corroboration is found in yet a later provision of section 4.1 of the Operating Agreement, which states, "Notwithstanding the foregoing and as described in Section 6. 1, *all cash* and other revenue generated *after the Closing Date* from Acquired Assets is solely the property of [XO]." (Emphasis added.) The parties needed to specify this—which was, after all, their agreement under sections 2.1(g)

and 2.2(a) of the APA—because, based on the definition of "Monthly Fee Receipts" in section 4.1 of the Operating Agreement, even *post-Closing Date* cash proceeds of pre-Early Funding Date accounts receivable would be excluded as a source of payment of XO's Management Fee. That is, the parties needed to specify that, notwithstanding such exclusion in the Operating Agreement, under the APA on the Closing Date XO acquired all accounts receivable and their proceeds paid after the Closing.

XO argued extensively that the Operating Agreement needed to be viewed throughout as a "cash accounting" rather than an "accrual accounting" document, and, therefore, that XO was entitled to base its Management Fee on all cash received (as opposed to "revenue generated") after the Early Funding Date. This argument was, however, largely (if not entirely) a red herring. It ignores that under the plain language of section 4.1 of the Operating Agreement the parties placed two limitations on the source of XO's Management Fee: first, XO would be entitled to be paid the fee only from revenue generated after the Early Funding Date (an accrual concept, consistent with the parties' agreement in section 2.1(b) of the Operating Agreement that XO would be obligated to pay only those expenses of the Sellers' business "newly accruing" after the Early Funding Date), and, second, payment of XO's Management Fee would be further limited to actual cash receipts (a cash concept). Given the parties' plain terms allo-

cating value based on the dividing line of the Early Funding Date, there is no reason to superimpose an overall accounting methodology on an agreement that does not mention or require it and, in fact, uses both accrual and cash terminology in a logical way.[24]

XO also relies to some extent on the last sentence of section 4.1 of the Operating Agreement, which states, "Sellers and [XO] agree to review the fee set forth above on a monthly basis and to negotiate in good faith a modification to such fee to reflect changing circumstances or operating results." Given that section 4.1 by its own terms contemplated the possibility of a "Payment Shortfall," it is hard to see, though, how the existence of such a shortfall between XO's Management Fee and XO's obligation under section 2.1(b) of the Operating Agreement to pay expenses could constitute "changed circumstances or operating results." In any event, XO did not establish that there was a material change in the Sellers' operating results from before to after the Early Funding Date. XO's problem lies, instead, with the terms of its Management Fee, for which the "re-negotiator" provision does not provide a remedy.

Accordingly, the Operating Agreement does not entitle XO to a Management Fee payable from the pre-Closing Date proceeds of pre-Early Funding Date accounts receivable.

 a. *No judicial estoppel.* Finally, XO argues that Allegiance should be judi-

---

**24.** The testimony of XO's accounting expert on this topic was not persuasive because, as the expert essentially acknowledged, he was not using any special accounting expertise to interpret the plain language of the parties' agreements. 5/4 Trial Tr. 197–204, 208–214, 221–222. (He and XO specifically take the position that the key phrase "revenue generated" "is not a generally accepted phrase in the accounting literature." XO's Post–Hearing

Memorandum of Law 38.) Instead, XO's expert worked backwards from what he concluded was a fair allocation of the benefits and obligations between the parties. 5/4 Trial Tr. 215–216, 227–228. On this point, therefore, his expert report read very much as if written by XO's lawyers, or anyone else without accounting expertise, who wanted the parties' agreements to be read in a way favorable to XO.

cially estopped from contesting XO's interpretation of the Management Fee because in an earlier dispute between the parties Allegiance allegedly took the position that XO was entitled to all post-Early Closing Date proceeds of accounts receivable. Judicial estoppel, however, requires that the party to be estopped in a subsequent proceeding have taken a position (a) clearly inconsistent with a position that it (b) successfully pursued in a prior proceeding, (c) such that the party would have an unfair advantage in the subsequent proceeding or an unfair detriment would be imposed on its adversary. *See Lowery v. Stovall,* 92 F.3d 219, 223–224 (4th Cir.1996); *In re Maxwell Newspapers Inc.,* 189 B.R. 282, 289 (Bankr.S.D.N.Y.1995) (emphasizing requirement that the court in the prior proceeding have adopted the inconsistent position).

■ First, Allegiance's statements in the prior dispute cited by XO were not clearly inconsistent with its present position, because Allegiance did not make the pre/post-Early Funding Date distinction that is critical to the present dispute.[25]

■ Moreover, the original dispute between the parties was settled without any admission of liability on the merits by either party,[26] and generally under such circumstances there is no "judicial adoption" of a party's position for judicial estoppel purposes. *Bates v. Long Island R.R. Co.,* 997 F.2d 1028, 1038 (2d Cir.1993), *cert. denied* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993) ("settlement neither requires nor implies any judicial accep-

tance of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel") (quotations omitted); *Edwards v. Aetna Life Insurance Co.,* 690 F.2d 595, 599 (6th Cir.1982).

Nor does the parties' settlement here, which involved the resolution of multiple disputes in light of numerous litigation-related and non-litigation-related considerations, come within the exception to this rule applicable to court-approved settlements and other non-litigated orders where judicial adoption of a party's position is implicit in and necessary for the court's approval. *Contrast Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 473 (6th Cir.1988); *In re Galerie Des Monnaies, Ltd.,* 62 B.R. 224, 225, 226 (S.D.N.Y.1986) (judicial estoppel notwithstanding absence of litigated result, because court approval implicitly required adoption of party's position) *and Teledyne Indust., Inc. v. NLRB,* 911 F.2d 1214, 1218–1219 (6th Cir.1990), *reh'g denied en banc* 1990 U.S. App LEXIS 22065 (6th Cir. October 26, 1990) (court did not necessarily adopt party's position in approving settlement: no judicial estoppel); *Devan v. CIT Group/Commer. Servs., Inc. (In re Merry–Go–Round Enters.),* 229 B.R. 337, 347 (Bankr.D.Md.1999); *Barrett–Crofoot Invs. v. Commissioner,* T.C. Memo 1994–59; 1994 Tax Ct. Memo LEXIS 60, 67 TCM CCH 2166 (T.C.1994). Here, the Court's approval of the XO Settlement did not hinge on the allegedly inconsistent position taken by Allegiance, and the ATLT's

---

**25.** See Trial Ex. 109 at 9, in which Allegiance argued, in the prior dispute, that "If XO is allowed to shirk its obligations to assume the liabilities on Exhibit K, the Debtors' estate will be left to cover the pass-through Subscriber Taxes even though it does not have the right to the receivables associated with those taxes." In its Proposed Findings of Fact and Conclusions of Law ¶ 147, XO highlights the

problem with its argument by inserting the phrase "pre-Early Funding Date" in brackets before the word "receivables" in the quoted passage, where it did not originally appear.

**26.** See June 23, 2004 Stipulation and Order Settling Certain Disputes between Allegiance and XO. Trial Ex. 12.

position in this litigation, seen in the light of the Court's prior approval of the XO Stipulation, does not jeopardize the Court's integrity, the underlying basis for judicial estoppel. *In re Maxwell Newspapers,* 189 B.R. at 289.

b. *Calculation of the amounts in dispute under the Operating Agreement and Allocation Agreement.* The parties agree that of the $99,610,039 of receipts during the term of the Operating Agreement, approximately $40 million to $41 million were on account of pre-Early Funding Date accounts receivable. Trial Ex. 148; 5/5 Trial Tr. 16–19; Myers Dep. Tr. 126.[27] The aggregate monthly expenses during the Operating Agreement were $95,953,897.[28] XO deducts[29] from this amount $15,108,661 of liabilities that it contends was separately dealt with under the terms of the June 23, 2004 Stipulation and Order Settling Certain Disputes between Allegiance and XO (the "XO Settlement").[30] XO concludes that the maximum Management Fee, therefore, is $102,498,807 ($78,845,236 × 130%). As discussed above, however, this fee is payable only from the $59,610,039 of cash comprising the pre-Closing Date proceeds of post-Early Funding Date accounts receivable, not the total $99,610,039 of post-Early Funding Date receipts.

To be offset against the $59,610,039 Management Fee, then, is the amount XO is required to reimburse the Sellers under section 2.1(b) of the Operating Agreement and the April 13, 2004 Allocation Agreement[31] pursuant to which the parties agreed, as the Early Funding Date approached, that Allegiance would continue to operate the business' cash management and accounting functions until the Closing Date, subject to XO's obligation to reimburse Allegiance within 15 days' receipt of invoices for applicable expenses paid by Allegiance. The ATLT contends, without providing any specific back-up, that Allegiance paid approximately $80 million of such reimbursable expenses during this period; XO contends that Allegiance wrote checks for $93,953,897 but established, however, that $9,245,296 of this sum actually was never paid because Allegiance swept all of the cash from its bank accounts at the Closing Date (Myers Dep. Tr. 71; 5/3 Trial Tr. 210) and XO, therefore, was left to pay such amount because Allegiance's outstanding checks for that sum would otherwise have bounced post-Closing Date for lack of funds. Trial Ex. 149; 5/4 Trial Tr. 246–248; 5/5 Trial Tr. 18–20.[32] Moreover, XO contends, as noted

---

27. The ATLT acknowledges that Allegiance did not institute procedures to identify receipts based on whether they were proceeds of pre-Early Funding Date accounts receivable or post-Early Funding Date accounts receivable, and that because Allegiance routinely carried forward its general ledger, the ATLT has lacked the resources to develop a more specific calculation that this $40 million-$41 million estimate. (It should be noted that Allegiance's failure to put such procedures into place does not, as XO alleges, override the plain meaning of the parties' agreements. There is no indication in the record that this failure was a knowing waiver. It also is not necessarily inconsistent with the plain meaning of the documents, particularly given that after the sale there were few people

left who were charged with protecting Allegiance's interests.)

28. Trial Ex. 148.

29. *Id.*

30. Trial Ex. 12. Whether this amount should, in fact be deducted from the aggregate monthly expenses is ultimately irrelevant to the Management Fee calculation because of the cap on the source of payment for that fee.

31. Trial Ex. 8.

32. The ATLT did not attempt to refute this $9,245,296 calculation.

above, that $15,108,661 of the liabilities paid by Allegiance was separately covered by the XO Settlement, bringing XO's aggregate reimbursement obligation down to $69,599,950. As noted, however, in connection with the "True-up" dispute, discussed in B.5. below, the ATLT contends that, in fact, $17,142,525 of liabilities was resolved pursuant to the XO Settlement.

Thus, after netting out its Management Fee, XO owes the ATLT between $9,989,911 and $7,956,087 (depending on the resolution in the "True-up" dispute of the amount of Disputed Liabilities actually paid under the XO Stipulation), plus interest, under section 2.1(b) of the Operating Agreement and the Allocation Agreement.

■ 4. *The Working Capital Adjustment dispute.* As noted above, section 3.4 of the APA provided for a purchase price adjustment based on the difference between estimated and actual working capital of the sold business as of the Early Funding Date. In addition to disputing the amount of this adjustment, the parties disagree whether XO forfeited its right to claim such an adjustment in excess ·of the approximately $1.06 million adjustment that it originally requested. (It is possible that the parties also continue to dispute whether an adjustment in XO's favor can be effectuated by means of setoff over and above the $7 million escrow provided for in section 3.4. However, in light of the contractual limitation plainly set forth in section 3.4,[33] if XO were entitled to such an

adjustment in excess of the amount in escrow, its recovery would be capped by the amount in the Adjustment Escrow Account and XO could not recover any deficiency through setoff; nor, of course, could any excess escrow amount be applied by way of setoff against other claims. *See* ·*Westinghouse Credit Corp. v. D'Urso,* 278 F.3d 138, 149–150 (2d Cir.2002).)

Whether XO lost its right to claim a higher Working Capital Adjustment depends, once again, on the terms of the APA. Under APA § 3.4(a), Allegiance was required not less than five business days before the Early Funding Date to prepare and deliver to XO a good faith estimate of Net Working Capital as of the close of business on the day immediately preceding the Early Funding Date (the "Estimated Early Funding Date Working Capital"). This Allegiance did,[34] whereupon XO complied with section 3.4(f) of the APA by paying into the Adjustment Escrow Account an additional amount of cash (approximately $1.3 million) equal to the amount that the Estimated Early Funding Date Working Capital exceeded the Base Working Capital.

Then, XO was required "[a]s promptly as practicable, but not later than sixty [60] Business Days after the Early Funding Date," to "prepare and deliver to [Allegiance] a good faith calculation of Net Working Capital as of the Early Funding Date (the 'Early Funding Date Working Capital')." *Id.* § 3.4(b).[35] As discussed in

---

**33.** See APA § 3.4(i), which states that "the Adjustment Escrow Account shall be the sole source of payment for any such deficiency and in no event shall Sellers be otherwise liable for such deficiency." See also *id.* § 3.2(b)(iii).

**34.** See April 6, 2004 letter setting forth calculation of Estimated Early Funding Date Working Capital. Trial Ex. 6. The estimate was as of April 9, 2004, while the actual Early Funding Date was April 14, 2004. Much of the

parties' dispute involves how to bring the Early Funding Date Working Capital current to April 13, the day before the Early Funding Date, but this does not change the Court's conclusion that the Sellers complied with section 3.4(a) of the APA by making a good faith estimate in Trial Ex. 6.

**35.** Both the Estimated Early Funding Date Working Capital and the Early Funding Date Working Capital calculation were to be prepared in accordance with GAAP and consis-

more detail below, XO timely delivered such a calculation in light of the information that it possessed,[36] which triggered the Sellers' right to disagree with XO's calculation within fifteen business days, *id.* § 3.4(c), which Allegiance did, asserting, to the contrary, that Allegiance was entitled to an additional $4,730,723.[37]

Thereafter, the parties had fifteen days to use commercially reasonable efforts to reach agreement on the disputed items or amounts, and, if unable to do so, they were required to cause a neutral nationally recognized accounting firm (defined in section 3.4(d) as the "Accounting Referee") to calculate the Early Funding Date Working Capital, which calculation was to be "final and binding upon [XO] and Sellers." *Id.* § 3.4(d).

Under section 3.4(d), "In making such calculation the Accounting Referee shall consider only those items or amounts as to which the parties have disagreed." It is this provision, the ATLT contends, that prohibits XO from subsequently materially revising its July 8, 2004 calculation. (XO's July 8, 2004 Early Funding Date Working Capital calculation claimed a $1,064,056 adjustment in XO's favor; subsequent calculations outside of the sixty day period, however, including those made by XO's expert months later, claim adjustments in XO's favor of approximately $9 million to $10 million.)

The ATLT does not prevail on this point, however, for two reasons. First, the ATLT did not insist on the Accounting Referee's prompt determination required by section 3.4(d). Second, and more importantly, Allegiance's own actions prevented XO from receiving financial information in Allegiance's possession that would have enabled XO to deliver a timely Early Funding Date Working Capital calculation adequately reflective of Allegiance's books and records. Granted, during the pre-Closing period the parties agreed under the Allocation Agreement that Allegiance, not XO, would continue to maintain its books and records. However, Allegiance also refused XO access to its books and records and computer systems, including, significantly, the general ledger system.[38] Moreover, on or about the Closing Date Allegiance removed relevant books and records without leaving a copy for XO.[39] This is not merely a basis for equitable estoppel; section 3.4(e) of the APA required that "[XO] and Sellers shall, and shall cause their respective Representatives to, cooperate and assist in the calculation of Early Funding Date Working Capital and in the conduct of the review referred to in Section 3.4(d), including providing reasonable and timely access to the books, records, work papers and personnel involved in preparing these calculations." Allegiance did not comply with this provision.[40]

tent with Allegiance's preparation of its unaudited balance sheet as of September 30, 2003. APA §§ 3.4(a), (b).

**36.** See July 8, 2004 letter regarding XO's calculation of Early Funding Date Working Capital and attached spreadsheet. Trial Ex. 14.

**37.** See July 21, 2004 letter regarding Early Funding Date Working Capital and attached spreadsheet. Trial Ex. 16.

**38.** 5/3 Trial Tr. 216–217; 5/4 Trial Tr. 154–156. Allegiance provided XO with spread-

sheet summaries of financial information, but they were not tied to the general ledger. 5/3 Trial Tr. 217; 5/4 Trial Tr. 155.

**39.** 5/3 Trial Tr. 220–221 222–223; 5/4 Trial Tr. 157–158; 5/5 Trial Tr. 170–171.

**40.** The ATLT's argument that XO's subsequent revisions of its Early Funding Date Working Capital calculation should be barred because not filed in accordance with the administrative bar date order entered in the chapter 11 case is even less persuasive than the ATLT's

The deadline for XO's calculation for purposes of the determination to be made under APA § 3.4(d), therefore, should terminate sixty days after the date that XO had access to such books and records of the Sellers as would reflect the Sellers' compliance with APA § 3.4(e). The Early Funding Date Working Capital calculation most recently communicated by XO to Allegiance as of that date shall be the relevant XO calculation for purposes of the Accounting Referee's final determination under APA § 3.4(d).

The determination of that date is reasonably tied to the remaining issue pertaining to the Working Capital Adjustment: the final resolution of the parties' disagreement over the proper calculation of the Working Capital Adjustment. As noted above, in section 3.4(d) of the APA the parties agreed to leave that calculation in the hands of the Accounting Referee. Instead, though, after trying to resolve the amount of the Working Capital Adjustment consensually they pursued this adversary proceeding. That was a mistake, and a mistake by the Court to let them proceed in that way.

Under APA § 3.4(d), the calculation of the Working Capital Adjustment clearly is the subject of mandatory alternative dispute resolution under the Federal Arbitration Act over which the Court may not exercise jurisdiction. 9 U.S.C. § 2; *MBNA Am. Bank, N.A. v. Hill (In re Hill),* 436 F.3d 104, 108, 111 (2d Cir.2006). *See also Omni Tech Corp. v. MPC Solutions Sales, LLC,* 432 F.3d 797, 799, 801 (7th Cir.2005), in which the Court of Appeals for the Seventh Circuit applied the FAA to a mandatory ADR provision almost identical to that contained in APA

§ 3.4(d). Having an independent "Big Four" accounting firm make this calculation does not inherently jeopardize or conflict with any objective or provision of the Bankruptcy Code. On the contrary, as shown by, among other things, the parties' trial presentations on this calculation issue, each of which ran the risk of not sustaining the burden of proof, the Court is ill equipped to make such a calculation. The Accounting Referee also is best equipped, and authorized under section 3.4(d), to determine when XO was provided with sufficient access to the Sellers' books and records under APA § 3.4(e) to make the Early Funding Date Working Capital calculation required by APA § 3.4(b) and to which the dispute resolution mechanism of APA § 3.4(d) is limited.

Consequently, this aspect of the adversary proceeding is stayed pending the delivery of the Accounting Referee's report as provided in APA § 3.4(d) and herein, or the consensual resolution of the Final Working Capital Adjustment calculation.

5. *The XO Settlement "True-up" dispute.* In the XO Settlement,[41] the parties agreed to resolve their dispute over whether the APA required XO or Allegiance to pay certain current liabilities (the "Disputed Liabilities"). They estimated such liabilities to be in the aggregate amount of $23,046,221. XO Settlement ¶ 3(a). In the XO Settlement, the parties agreed that XO would pay $11 million on account thereof, provided that if actual Disputed Liabilities were determined to be less than the estimated amount, Allegiance would pay XO a percentage of the difference, determined by dividing $11 million by $23,046,221 (the "True-up"). *Id.* ¶ 3(b). As noted above, XO and the ATLT disagree over the

---

contractual preclusion argument. The APA, not the administrative bar date order, governs the parties' rights in respect of the Working Capital Adjustment.

**41.** Trial Ex. 12.

amount of the Disputed Liabilities that was actually paid; the ATLT asserts that $17,142,525 of Disputed Liabilities was actually paid,[42] while XO's most recent calculation states that only $15,108,661 was paid.[43] (As discussed in B.3.(b)., above, moreover, the resolution of this amount also is relevant to calculation of the amount owed by XO under section 2.1(b) of the Operating Agreement and the Allocation Agreement.)

As with the Working Capital Adjustment, the parties agreed in the XO Settlement upon a definitive alternative dispute resolution process for calculating the True-up. In fact, with certain modifications with which the parties have complied, they incorporated the procedure contained in APA § 3.4(d),[44] to which the Court must defer for the same reasons it deferred to the ADR procedure for resolving the Working Capital Adjustment calculation dispute. Accordingly, this aspect of the adversary proceeding is stayed until the Accounting Referee delivers its report calculating the applicable percentage for the True-up, or the dispute is consensually resolved.

 6. *The security deposits dispute.* As noted above, under APA § 2.2(a) XO did not acquire the Sellers' cash and cash equivalents existing as of the Closing Date. On the other hand, the Acquired Assets specifically included "the Assumed Contracts, . . . including any related security deposits . . . ." *Id.* § 2.1(e). XO claims that this more specific provision entitles it to the benefit of $1,062,646.50 of letters of credit, and related cash and certificates of deposit posted to secure such letters of credit, issued for the account of Allegiance and for the benefit of the landlords under

three Assumed Contracts, the leases of Allegiance's former office space in Boston, New York and Dallas.[45] XO did not provide the underlying leases or copies of the letters of credit or security agreements between the letter of credit issuers and Allegiance or describe the status of the letters of credit, their proceeds or the cash securing any reimbursement obligations. On that basis alone, XO has not sustained its burden of proof and/or the dispute was not ripe.

 It may be noted, however, that given the tripartite nature of letters of credit, a beneficiary/landlord would not have a security interest in the letter of credit, let alone the cash securing Allegiance's reimbursement obligation to the letter of credit issuer. *See New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 91 (2d Cir.2003):

> Section 506(a) of the Bankruptcy Code defines a 'secured claim' as 'an allowed claim of a creditor secured by a *lien on property in which the estate has an interest.*' 11 U.S.C. § 506(a) (emphasis added). Here, NED's only interest is in the letter of credit issued to Dairy Mart by the bank; it has no direct interest in any of Dairy Mart's property. It is the nature of a letter of credit (as well as its utility) that the obligation to the beneficiary (here, NED) runs from the bank. NED argues that it has a sufficient interest in Dairy Mart's property based on the collateral Diary Mart must have furnished to the bank to obtain the letter of credit; but such an

---

42. Trial Ex. 267.

43. Trial Ex. 157.

44. XO Settlement ¶ 3(b).

45. XO's Proposed Findings of Fact and Conclusions of Law ¶ 275.

arrangement does not satisfy the requirements of section 506.

Consequently, the Sellers did not sell the letters of credit to XO, and, to the extent that the ATLT is entitled under the letter of credit documents and the underlying leases to the return of any excess letter of credit proceeds or the cash collateral securing the reimbursement obligation, such cash should be viewed as an Excluded Asset under the APA.[46]

7. *Funds in transit.* The ATLT contends that it is entitled to $414,074 of cash received by XO post-Closing, of which XO has agreed that $57,427 derives from Excluded Assets and is properly the ATLT's.[47] XO's basis for not paying the remaining $356,647—that these "were funds in transit at the time of Closing, constitut[ing] proceeds of Early Funding Date Assets"[48]—is not valid, however, because under section 2.2(a) of the APA, the Excluded Assets include "uncollected checks *and funds in transit* to the extent there is a corresponding reduction in accounts receivable included in Acquired Assets." (Emphasis added.) The ATLT should be paid such funds, with interest, provided there is a corresponding reduction in accounts receivable included in the Acquired Assets.

8. *Payment of other disputed liabilities.* The ATLT disputes only approximately $273,000 of the $2,022,535.77 of un-cleared pre-Closing Date Allegiance checks in respect of Excluded Assets that XO caused to be honored post-Closing, and XO acceded to such a deduction.[49] Accordingly, XO is fully subrogated to the holders of the $1,749,516 of Allegiance liabilities that it paid.

The ATLT also does not dispute that it owes XO, and has reserved for, all of its tax obligations under APA § 6.12, presumably with interest.

XO no longer appears to dispute that it must reimburse the ATLT for severance payments for which it is liable under sections 2.3(e) and 6.8(b) of the APA and section 2(c) of the XO Settlement, contending that such amounts are included in its calculation of its reimbursement obligation under section 2.1(b) of the Operating Agreement and the Allocation Agreement.[50] Nor does XO dispute the ATLT's claim to certain tax refunds, which XO should pay to the ATLT, with interest.[51]

*Conclusion*

For the foregoing reasons, the ATLT is directed to settle an order consistent with this memorandum of decision on five business days notice to counsel for XO.

46. The Court takes judicial notice that the Dallas landlord has drawn on one of the letters of credit. It may have done so, however, as a result of XO not having performed its obligations with respect to the assumed lease, which may give rise to a future dispute between the ATLT and XO, although, again because of the tripartite nature of letters of credit, it would appear that the ATLT would not have a subrogation claim against XO as a result of such breach. *Cf. In re East Texas Steel Facilities, Inc.*, 2000 WL 340281, 2000 U.S. Dist. LEXIS 4106 (N.D.Tex. March 31, 2000).

47. See XO's Proposed Findings of Fact and Conclusions of Law ¶ 280.

48. *Id.*

49. See the ATLT's Proposed Findings of Fact and Conclusions of Law ¶ 330; Trial Ex. 128; 5/4 Trial Tr. 40–44.

50. See XO's proposed Findings of Fact and Conclusions of Law ¶ 279.

51. *Id.* ¶ 281.